## BALDWIN v. JARDINE MATHESON & CO., Limited.

(Circuit Court of Appeals, Second Circuit.   November 8, 1919.)

### No. 13.

1. PRINCIPAL AND AGENT ⬤⟿124(3), 174—AUTHORITY TO PURCHASE AND RATIFICATION QUESTIONS FOR JURY.

In an action by a broker for commission on a sale of merchandise, whether the agent who made the purchase had authority, or whether, if not, his action was ratified by his principal, both *held* questions for the jury.

2. BROKERS ⬤⟿63(1)—COMPENSATION EARNED ALTHOUGH SELLER REFUSES TO PERFORM.

It is sufficient to entitle a broker to his compensation if it appears that a sale was effected through his agency in procuring a buyer, and his right is not affected by refusal of the seller to perform the contract made, whether in good or bad faith.

3. TRIAL ⬤⟿139(1)—AUTHORITY TO DIRECT VERDICT.

The court may only direct a verdict where the evidence is undisputed, and so plainly preponderant that it practically becomes conclusive, so that reasonable minds could not differ as to the conclusions to be drawn from it.

Hough, Circuit Judge, dissenting.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Southern District of New York.

Action at law by Francis H. Baldwin against Jardine Matheson & Co., Limited. Judgment for defendant, and plaintiff brings error. Reversed.

Max D. Steuer, of New York City, for plaintiff in error.

Norwood, Appell & Walsh, of New York City (Carlisle Norwood, of New York City, of counsel), for defendant in error.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The plaintiff in error (plaintiff below) sues to recover commissions earned for services he rendered in procuring a purchaser for 10,000 base boxes of tin plate. His commission was to be such sum of money as was received in excess of $8.50 per base box. After hearing the evidence of both plaintiff and defendant below, the court directed a verdict in favor of the defendant, against the objection and exception of the plaintiff. We shall refer to the parties as plaintiff and defendant, as in the court below.

[1] The question presented here is whether, upon the testimony given at the trial, a jury question was presented which required its submission to the jury impaneled. The complaint alleges that on the 9th of January, 1918, the plaintiff and defendant entered into an agreement wherein and whereby the plaintiff agreed to sell, for the account of the defendant, 10,000 boxes of tin plate, and that the defendant agreed to deliver such boxes to the buyer secured by the plaintiff; that the plaintiff secured a buyer, the American Trading Company, for such boxes of tin plate at a price of $9.25 per base box. The defendant agreed to and accepted the terms of the sale, payment to be made upon receipt of the tin plate at the dock of the American Trading Company at Yokohama, Japan, and therefore the plaintiff was entitled to 75 cents for each box of tin plate so sold. It was further alleged that, in violation of the agreement made with the American Trading Company, the defendant refused to make delivery of the boxes of tin plate, or to pay plaintiff his commission.

The plaintiff's contract was oral. He sought an interview with Mr. Wardell, representing the defendant, which company had a large quantity of tin plate for sale. Plaintiff testified that he was requested to secure a purchaser at $8.25 per base box, and was offered all in excess of such sum as he could obtain. Mr. Wardell wrote the quantity and price on a piece of paper and handed it to plaintiff at the interview. Plaintiff then saw a representative of the American Trading Company, Mr. McChesney, who was in charge of the Japan exports, and offered the tin plate to him. The latter said he could use it and would cable Japan. Report of this was made to Mr. Wardell, who said that this was fortunate, because he had an export license for Japan. However, he declared, there were extra expenses in such a shipment, and stated the price to them must be $8.50 per box, instead of $8.25. On January 15th Mr. McChesney informed the plaintiff that he accepted the tin plate; that it could be used by the American Trading Company in Japan. A report of this was made to the defendant, and this to a Mr.

Crombie. Thereupon Mr. Crombie refused to deliver the tin plate at $8.50 per box, and requested $9. A dispute arose as to this, and the plaintiff left the office. Later Mr. Crombie telephoned Mr. Baldwin, and advised him to settle the matter and take $2,500 for his services in selling the tin plate. The plaintiff requested that this be put in writing. Plaintiff then saw Mr. McChesney, who requested him to take a Mr. Kelly, of the American Trading Company, around to the office of the defendant, so that he might examine the license and arrange about the terms. This was done. Crombie then refused to permit Kelly to see the export license and later insisted that the American Trading Company must pay cash or give a certified check for the goods. This led to a dispute, which was finally settled by Mr. Crombie's talk with his superior, and the American Trading Company was then accepted as a purchaser. Mr. Crombie then stated that the goods might be shipped to Japan, and the documents exchanged on the other side; the cost, freight, and insurance to be charged against them. Plaintiff was then asked:

"Q. And then what did you gentlemen do? A. Why, Mr. Kelly then went down to—Mr. Kelly and I went down together. Well, Mr. Kelly and I went to lunch together.

"The Court: Kelly accepted that, did he?

"The Witness: Well, he thought everything was all satisfactory, and told me so at the table when we were eating dinner.

"Q. And that closed the incident? A. Absolutely."

Later the same day Mr. McChesney telephoned the plaintiff that the tin plate had been sold. Plaintiff further testified on cross-examination:

"Q. During all these transactions, was nothing said at any time as to where the tin plate was to be delivered? A. Surely, with Kelly. After Mr. Crombie had gone in and had seen his superior, he came back and he said, 'We will accept your conditions and ship it abroad, and we will exchange documents on the other side.' I was rather surprised in his change of attitude, and when I went to Mr. McChesney, and told him about it, Mr. McChesney said 'Well, I am not surprised at that offer, because in Japan we have always exchanged courtesies with Jardine Matheson & Co., and our companies know one another very well.' And he said, 'I am surprised that he made such exacting terms and such arbitrary terms.' He was surprised that they demanded cash right here in New York."

Kelly saw the export license. It appears from the testimony of the plaintiff that the essential terms of the contract were agreed upon, the goods were to be billed at $9, payment in New York, and delivery C. I. F. Japan, American Trading Company's dock at Yokohama, with an exchange of documents on the other side. It was after this that Mr. Crombie telephoned to Mr. McChesney that the sale was off.

The reason assigned for the action of the District Judge was that Mr. Kelly had no authority to bind the American Trading Company, and that his acceptance of the terms could not be said to be an acceptance by the company. But the testimony is that Mr. Kelly did not come merely to inspect the form and words of the license, but was authorized to obtain an option on the plate and arrange terms of payment and delivery. The terms were discussed as above related, which were op-

posed by Mr. Kelly. His opposition seems to have secured to the American Trading Company a more advantageous contract, for the proposal to ship to the coast was Kelly's. It was at first refused by Crombie, and later accepted after his talk with his superior. Indeed, Kelly was the person sent by McChesney to see the defendant's representative and report the terms of sale to Mr. McChesney. This was also done by Baldwin. If Mr. Kelly did not have the authority to make the terms, there was a ratification of Kelly's bargain by Mr. McChesney. The terms were reported by both Kelly and Baldwin. Mr. McChesney, who had authority to buy, accepted the terms.

In Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1183, the court said:

"A principal can adopt and ratify an unauthorized act of his agent, who in fact is assuming to act in his behalf, although not disclosing his agency to others, and when it is so ratified it is as if the principal had given an original authority to that effect, and the ratification relates back to the time of the act which is ratified. He must disavow the act of his agent within a reasonable time after the fact has come to his knowledge, or he will be deemed to have ratified it. Bringing a suit upon the contract of his agent, which was unauthorized at the time and in excess of the authority conferred upon the agent, is a ratification of the unauthorized act; and it is no answer to the ratification that prior to its taking place the principal is not bound, and hence there is no right on the part of the other party to enforce as against him the unauthorized act of his agent. These principles are well known. * * *"

Crombie was the general manager of the export department of the defendant. McChesney had authority to purchase the tin plate for the American Trading Company for export to Japan. And the authority of Kelly to inspect the license or accept terms of sale, under the proof disclosed, at least presented a question of fact for the jury.

Another question was presented upon the evidence in the record, if the jury found Kelly had no such authority, and that: Was the action of Kelly ratified by the American Trading Company under the circumstances disclosed in the record? Here, from the failure to dissent, under the circumstances, the ordinary intelligent man would be justified in inferring that the principal, the American Trading Company, assented. Where reasonable men may fairly draw from the evidence an inference that there was such assent, the question is one for the jury. It is only where reasonable men can fairly draw only one inference from the facts stated that the court may decide the question is one of law.

The purpose of seeing the license seems to have been to ascertain whether the tin might be shipped to Japan, in view of the war regulations which might forbid. It did not follow that Mr. McChesney intended that the American Trading Company would be the consignee named in the license. The cablegrams indicate this. Whether or not the defendant had such a license as was within the contemplation of the parties' intent at the time of the contract was a jury question. The name in the license could be changed on request. Indeed, the need for the license on the part of the American Trading Company was dispensed with, for it was agreed to make actual delivery by way of the Pacific coast and then C. I. F. Japan, and exchange documents on

the other side. What the parties intended by the several cablegrams which were exchanged, was a question for the jury. The cable was some evidence, but not conclusive evidence, of the attitude of Mr. McChesney toward the bargain made between Kelly and Crombie on the 17th. It was of some probative value, but was not conclusive. It may be deemed some evidence of Mr. McChesney's mind in regard to the contract, but that was all. Later cablegrams may just as well be argued as a support of plaintiff's theory that McChesney ratified Kelly's act, and approved the contract, and endeavored to sell in Japan.

[2] The plaintiff was entitled to succeed, irrespective of whether the defendant acted in good or bad faith in endeavoring to deprive him of his commission. There is no difference between failure to perform because of bad faith or because of inability. This has been expressly held in Dotson v. Milliken, 209 U. S. 237, 28 Sup. Ct. 489, 52 L. Ed. 768. See, also, Gilder v. Davis, 137 N. Y. 504, 33 N. E. 599, 20 L. R. A. 398; Charles v. Cook, 88 App. Div. 81, 84 N. Y. Supp. 867; Rosenstein v. Bogel, 124 App. Div. 527, 108 N. Y. Supp. 957; Folinsbee v. Sawyer, 8 Misc. Rep. 370, 28 N. Y. Supp. 698. It is sufficient to entitle the broker to his compensation if it appears from the evidence that a sale was effected through his agency in procuring a buyer. If his communications with the purchaser have been the means of bringing the purchaser and principal together, and the sale agreed upon in consequence thereof his right to compensation is perfect. The broker is not entitled to compensation for unsuccessful efforts to make a sale unless the failure had been caused by fault of his principal. When he has been allowed a reasonable time to effect a sale, and has failed, and the principal has in good faith terminated the agency and effected the sale through his own efforts the latter is not liable for commissions. Walton v. Chesebrough, 167 N. Y. 606, 60 N. E. 1121; Levering v. Paova Oil Co., 243 Fed. 553, 156 C. C. A. 251; Hammond v. Crawford, 66 Fed. 425, 14 C. C. A. 109.

[3] If the evidence created prima facie that a sale was effected, and that the plaintiff was the procuring cause in bringing the purchaser and seller together, it is improper to direct a verdict. The court may only direct a verdict where the evidence is undisputed, and so plainly preponderant that it practically becomes conclusive, so that reasonable minds could not differ as to the conclusions to be drawn from the testimony. Standard Trust Co. v. Commercial Nat. Bank, 240 Fed. 303, 153 C. C. A. 229; Swiss v. Zimmermann, 240 Fed. 87, 153 C. C. A. 123; Shadoan v. Cinn. R. R. Co., 220 Fed. 68, 135 C. C. A. 636.

We are of the opinion that the evidence is sufficient to require the submission to the jury of the question whether or not both parties consider that negotiations had resulted in a definite agreement which they agreed to consummate. If the jury answered this question in the affirmative, it would follow that the plaintiff, employed by the defendant, had done all that he was requested to do, and had earned his commissions, and cannot be deprived thereof by the failure of his employer to consummate the bargain.

It was error to direct a verdict for the defendant, and for this reason the decree is reversed.

HOUGH, Circuit Judge (dissenting). If one regards the complaint herein, Baldwin was not a broker, and did not sue as one, nor for a commission. He was a salesman, entitled to everything over a certain price when *he* sold a definitely specified lot of goods. No such sale was ever made. But, if a broker's employment be somehow spelled out, then both the alleged vendor and vendee testified fully that their minds never met; while that no sale resulted from plaintiff's efforts, and that such efforts in no way assisted in the final disposition of the goods, is admitted.

Plaintiff's efforts failed, because the parties to the proposed sale could not agree about the license, so important in war time; therefore there never was a contract. This court in substance holds that there should have been a contract, and therefore gives a jury a chance of saying that there was one. I cannot agree to that, and dissent.