## Lovering *versus* The Buck Mountain Coal Company.

1. A coal company under its charter constructed a railroad to connect with Lehigh Navigation, which thus notoriously became indispensable for the transportation of its coal. All contracts with the coal company were made in view of these facts.

2. The coal company contracted with plaintiffs for the delivery of a large quantity of coal during a season; before the time for delivery of a large part of the coal, a flood swept away all the works of the navigation company, so that the coal company were prevented from fulfilling their contract. *Held*, that they were excused from compliance while they were so prevented.

3. The coal company would be relieved from exact compliance by an act of God over which they could have no control and which they, not being the owners of the navigation works, could not have provided against.

4. In the contract the company stipulated for an advance in price, if any advance on freight and tolls accrued before a time fixed. The company had a right to be paid for any such increase by the most usual and ordinary mode.

5. The offer to furnish coal on the basis of the contract including advance on freight and tolls, if refused, was a sufficient compliance by the company.

February 12th 1867. Before WOODWARD, C. J., THOMPSON, STRONG and READ, JJ. AGNEW, J., at Nisi Prius.

Certificate from Nisi Prius.

This was an action of assumpsit to January Term 1864 by Joseph S. Lovering and others, trading as Joseph S. Lovering & Co., against the Buck Mountain Coal Company. The plaintiffs declared in assumpsit on a contract by which the defendants agreed to deliver them "4000 tons of the best quality Buck Mountain egg coal," to be delivered at such times as the plaintiffs required in the plaintiffs' carts at the defendants' wharf, at $3.43 per ton, and for the last 3000, in "addition any advance in freight and tolls which might take place on or before the 1st day of July 1862," the plaintiffs to pay the government tax; the breach was the failure to deliver according to the contract.

[Lovering *v.* Buck Mountain Coal Co.]

The negotiation which resulted in the contract sued on commenced with the following letter from the plaintiffs:—

" Philadelphia, 16th April 1862.
" Mr. Wm. P. Jenks, Pres't.
" Dear Sir:—Please inform us of your lowest price for 4000 tons Buck Mountain Egg Coal, best quality, to be delivered at such times as we may require it, in good order, weighed in our carts, from your wharf, on Beach street above Poplar.
" Payment to be made on the 1st of each month for the delivery of the preceding month."

After some further correspondence and negotiation, the parties completed the contract through the following two letters:—

" Philadelphia, May 28th 1862.
" Messrs. Jos. S. Lovering & Co.
" Gents:—The Buck Mountain Coal Company will furnish you with 4000 tons, 2240 lbs. each, of their best quality egg coal upon the conditions stated in your note of the 16th ult. ; the first 1000 tons at $3.43 per ton, the balance, say 3000 tons, at $3.43 per ton, with the addition of any advance in freights and tolls which may take place on or before July 1st 1862, you paying any tax that may be imposed by the government. The coal delivered in the present month to be considered as a portion of the quantity contracted for.
" This proposition, if accepted by you, will annul those contained in ours respectively of the 21st ultimo and 27th instant.
" Yours, respectfully,
" W. P. JENKS, Pres't."

" Philadelphia, May 28th 1862.
" Mr. Wm. P. Jenks, Pres't.
" Dear Sir:—We have your favor of this date, and accept your offer therein contained, to furnish us with 4000 tons of your egg coal.        Yours, truly,
" JOS. S. LOVERING & Co."

In June 1862, there was a very disastrous flood on the Lehigh river, which carried away the works of the Lehigh Navigation Company. Shortly after Mr. Jenks called on the plaintiffs, and informed them that by reason of this destruction of the navigation the defendants could not furnish the coal; that it was an act of God, and they were not responsible. The plaintiffs on the trial gave evidence of their purchase of 437 tons of the first 1000 of other persons than the defendants, at prices above the contract price. The defendants, under exception, proved that the Lehigh Canal was the only outlet by which they could ship coal to market. They also proved the cost of transporting coal

[Lovering v. Buck Mountain Coal Co.]

between the time of the freshet and July 1862; also that the plaintiffs, June 10th, offer to receive " steamboat coal" from the defendants, instead of egg coal, and the declining of the offer by the defendants; also plaintiffs' letter of June 20th, inquiring whether defendants intended to abandon their contract, and again proposing to take steamboat coal or Lehigh coal; with defendants' reply of the 21st, that they did not intend to abandon the contract but adhere to it as far as in their power; also letter of plaintiffs of 24th, notifying defendants that they would supply their wants elsewhere, and hold them responsible for the loss; also letter of July 3d from plaintiffs, referring defendants to their counsel, Mr. Gibbons; letter July 10th, from Mr. Guillou, defendants' counsel, to Mr. Gibbons, informing him that the defendants would be prepared to deliver the monthly supply " for this and the remaining month of the contract time * * and under the increased rates of freights and tolls existing on and before the 1st inst. (decreased since that date), the coal will cost your clients at least $7 per ton.

" The act of God, which for a time stopped our supply of coal, bears in respect of the last 3000 tons so onerously on your clients that we feel it would be a hardship to hold them to their purchase.

" Cannot this whole matter be settled without litigation ?"

Also from Mr. Guillou to plaintiffs, July 16th :—

" Gents :—As you have made no calls upon the Buck Mountain Coal Company for the usual supply of coal for this month, I have been requested by my client to say to you that although they have been prevented by the act of God from delivering to you the balance of the first 1000 tons under the contract, they are prepared and offer to deliver to you the usual quantity monthly in satisfaction of your claims for the remaining 3000 tons, as you may call for it as heretofore.

" They will of course expect payment on the 1st of each month, covering increased freights and tolls.

" My letter of the 10th inst. was intended to elicit your orders, but none have been received. I am requested to write more definitely."

Also Mr. Gibbons to Mr. Guillou, that the correspondence between the parties had been closed, adding: " I understand your two letters to amount to an admission that the Buck Mountain Coal Company have on hand 3000 tons of coal, which they purpose to deliver to us at $7 per ton. This proposition is too absurd to merit notice."

Also, July 18th, from Mr. Guillou to Mr. Gibbons :—

" My Dear Sir :—Your favor of yesterday's date just to hand. My letters referred to must, of course, speak for themselves;

[Lovering *v.* Buck Mountain Coal Co.]

they are intended to ask that your clients should comply with their engagements to take coal at the rates agreed upon by them. The company will, and offer to, furnish it them as usual at their demand. You are in error in supposing that any admission has been intended that there are 3000 tons on hand here at the present time ; the 'two letters' were not intended to amount to any such admission, for the fact is otherwise."

Also letter of plaintiffs to defendants, October 20th 1863, referring to defendants' letter of June 10th 1862, and saying :—

" As we understand that the navigation has been repaired so that coal can be furnished from your mines, we beg to inquire whether you are prepared to resume supplying us as promised in your letter above mentioned, or whether you prefer the question of your liability should be tested by a suit at law. We have not commenced any legal proceedings against you on your contract, because we have been content to afford you every reasonable opportunity to settle the matter without litigation."

And Mr. Jenks replied, October 23d :—

" This company has no desire that the correspondence shall be re-opened, especially in view of your failure to adhere to your contract by first refusing to accept the offer contained in letters of 10th and 16th July 1862, to deliver your coal as usual. Second, refusing to pay for the coal which you received in June 1862, thus putting us to the necessity of suing you for its price.

" There was but one explanation of your course possible, viz. : that in view of the ' advance in freights and tolls,' you had found it to your interest to not accept the coal offered to you, and throw up your contract.

" With the single remark that you are entirely in error in the supposition that the ' navigation has been repaired,' &c., you will permit me without prejudice to pass over the rest of your letters in silence."

The defendants also proved that about July 1st 1862 they presented to plaintiffs a bill for 172 tons of coal delivered up to June 3d 1862, amounting to $589.96, and that payment was declined.

The points of the parties and the answers of the court were as follows :—

By the plaintiffs :

1. The freshet in the Lehigh river of June 1862 and its results, as given in evidence, furnish no defence in law to the plaintiffs' claim.

Answer : " Not assented to."

2. The defendants were bound by their contract to have in their yard at Beach street the coal called for by the contract for deli-

[Lovering *v.* Buck Mountain Coal Co.]

very to the plaintiffs as required by them.  And if the jury believe that they had no such coal there after the date of the freshet, or failed to deliver it thereafter, when required, they are responsible in damages for such default.

" Answered in the general charge, and not assented to other than therein contained."

3. The measure of damages is the difference between the contract price and the market price of the coal in Philadelphia, after default in delivery by the defendants.

" Assented to."

4. There is no evidence of any advance in freight and tolls after the contract and on or before the 1st of July.

" I cannot affirm this point.  I think there is, but that is a fact for the jury."

By the defendants:

1. The contract between the parties read in evidence is to be understood as the mass of men would understand it ; and is to be construed on the basis of circumstances, about which the parties may be reasonably supposed to have contracted and not others they never thought of.

Answer: " Affirmed."

2. Where the performance of a contract to furnish an article becomes impossible by the act of God, and without any fault in the party bound to furnish it, the performance of the contract is excused.

Answer: " Affirmed."

3. If the jury are satisfied from the evidence that, without any fault on the part of the Buck Mountain Coal Company, their performance of the contract to deliver coal became impossible, then the defendants are not liable in damages for their failure during such time as the impossibility continued.

Answer: " Affirmed."

4. If the jury find that the defendants offered on the 10th July 1862, to furnish to plaintiffs " their monthly supply for that month and the remaining months of the contract term," and the plaintiffs did not after such offer make any demand for coal or send their carts to plaintiffs' wharf for any, then the plaintiffs can have no claim for damages by reason of non-delivery after that date.

Answer: " I assent to this point as applicable to the three thousand.  See general charge as to the one thousand."

5. If the jury find from the evidence that the plaintiffs failed or refused early in July to pay the defendants " for the delivery of coal to them of the preceding month," then after such refusal the defendants were no longer bound to continue delivering coal in pursuance of the contract.

" Not assented to."

6. If the plaintiffs paid for coal, in and after June, a price less than they would have been obliged to pay under the contract, viz., $3.43 per ton, with addition of the advance in freights and tolls, which had taken place prior to 1st July, then instead of being damaged they have been benefited, and in the assessment of damages allowance must be made for the loss thus avoided to the plaintiffs, and which adherence to their contract would have occasioned them.

Answer: " Not assented to."

THOMPSON, J., after reciting facts, charged:—

" In view of these facts thus before us, for their existence is not so much disputed as their effect, I instruct you:—

" 1. That the contract in question was entered into with the defendants, miners and transporters of coal, to be delivered at a certain point or place designated. This was not a purchase of coal in market, but to be brought there, and it must be presumed the place from whence it was to be brought was known, and in view of the parties as well as the mode of transportation, where but one existed. If, therefore, the only medium of transporting the coal in quantities such as would be required in the present contract was destroyed by an inevitable flood, and the defendants were thereby prevented from fulfilling the contract, they are excused from compliance therewith during the time they were so prevented, but no longer. The act of God, as I have already informed you, injures no one. In other words, no one is entitled to recover damages on account of injuries therefrom.

" 2. That the defendants may shelter themselves from liability to damages for non-delivery of coal during the time after the occurrence of the disaster and before they were able to resume its performance; measuring that time by the time of the offer to furnish coal, it was about one month.

" Was this unreasonable delay ?

" 3. When the defendants offered to resume a compliance of their contract, they had a right to insist on an advance in freight and tolls, if any advance occurred on or before July 1st 1862, from any cause which they could not control. The agreement to pay advance freight and tolls is general, and it applies to increase by the most usual and ordinary mode. Did an increase occur before the 1st July ? If it did, and lasted up until performance or offer of performance by the defendants, they had a right to demand it. The offer to furnish coal, therefore, on the basis of the contract, including the advance freight and toll, if any existed, was, if made and refused, a sufficient compliance on the part of the defendants, and if the plaintiffs did not choose to take coal, the fault is theirs, and they cannot recover damages if the offer was made in good faith. So in regard to the demand for the coal in 1863 by the plaintiffs. If they declined to take them after an offer

[Lovering *v.* Buck Mountain Coal Co.]

made in July 1862, which we have said was within the terms of the contract, so far as the demand for increased tolls and freight was concerned, their demand in 1863 goes for nothing. These offers to perform, if I recollect aright, refer exclusively to 3000 tons, on which the advance in freights was applicable, and not to the residue of the first 1000 tons, to which it did not apply.

"4. If the defendants are to be excused on account of the destruction occasioned by the flood, and tendered compliance as soon thereafter as possible, we have said that, as to the 3000 tons, if that was the extent of the tender or offer on the terms of the contract as to advance freight and tolls, it will be a defence against the plaintiffs so far. But what excuse have they for non-delivery of the 437 tons undelivered of the first 1000 tons to be delivered? No offer was made of that as I remember. It was to be delivered at $3.43, no matter what increase in the expenses of transportation occurred. As the defendants asserted their determination to adhere to the contract they must perform or offer to perform it in all its parts. If I am right in supposing that there was no delivery or offer to deliver this coal, the plaintiffs will be entitled to damages for its non-delivery, and that will be the difference between the price agreed to be paid for it and what the plaintiffs had to pay for coal to supply its place, and interest.

"I am reminded that the contract was entire and not separable in performance. I have thought of this, and, although it is not clear of difficulty, yet I am of opinion that the contract allows us to interpret it as separable for the purpose of performance. The first 1000, as distinctly designated in the contract, is to be delivered at a fixed and certain price, under all circumstances of possible compliance—payments in the order fixed by the contract,—and was to be monthly—and if an advance had taken place, as it did on the remainder of the coal, the accounts in regard to the first 1000 tons would have designated it as distinctly as if under a distinct contract.

"It so turned out that before the 1st of July an advance of freights and tolls did occur as to the 3000; but did not, for it could not, as to the 1000. As the defendants claimed to adhere to the contract—performance for these reasons, it seems to me, became separable, and that the case is not within the rule suggested by the plaintiffs' counsel; and I think the justice of the case requires us so to treat it. Nothing was said by the plaintiffs about want of an offer of entire compliance by the defendants—the difficulty seems to have been in regard to the increased cost of coal on account of the advance in freights and tolls, they seeming to rely on the law as they assert it, that the act of God did not apply to excuse the performance of the contract, and could furnish no grounds for the advance in freights and tolls. Under

[*Lovering v.* Buck Mountain Coal Co.]

the circumstances a recovery may be had for the deficiency in the performance as to this 437, if not for the 3000 tons, it not having been delivered, if it was not offered to be delivered. I therefore charge you, on these views of this contract, that we think the plaintiff is entitled thus far to recover, so far at least as the law of the case is concerned : the facts are for you.

" I do not regard the plaintiffs' case as improved by the offer to take steamboat coal under the circumstances, nor to accept Lehigh coal. The defendants might choose, as they did, to stand on their contract, and having done so, they must show performance or offer of performance, and we have, we think, commented on that part of the case sufficiently to render our views comprehensible by you.

" The defendants have no grounds for defeating the plaintiffs' recovery, because of the failure to pay for the 172 tons remaining unpaid of the first 1000 tons. They might have made it a ground of rescission, but they waived this both by acts and declarations.

" Should you find for the plaintiffs, you may defalk from the damages the amount of the unpaid bill, and if it do not extinguish the damages incurred, return a verdict for the balance. If under the evidence you think the plaintiff is not entitled to damages (and I hardly think you can come to this conclusion), then the verdict will be for the defendants."

The verdict was for the plaintiffs for the difference between the contract price and the price paid by them on 437 tons.

The plaintiffs removed the case to the court in banc and there assigned for error :—

That the court did not affirm their 1st, 2d and 4th points, and that, if the only medium of transporting the coal, in quantities such as would be required in the present contract, was destroyed by an inevitable flood, and the defendants were thereby prevented from fulfilling the contract, they were excused from compliance therewith during the time they were so prevented, but no longer.

That the defendants might shelter themselves from liability to damages for non-delivery of coal, during the time after the occurrence of the disaster, and before they were able to resume its performance.

That if the jury were satisfied from the evidence that, without any fault on the part of the defendants, their performance of the contract to deliver coal became impossible, then the defendants were not liable in damages for their failure during such time as the impossibility continued.

*C. Gibbons* and *G. M. Wharton*, for plaintiffs in error.— There was no physical impossibility of supplying the coal. The only question is which party should pay the additional cost.

[Lovering v. Buck Mountain Coal Co.]

The contract called for no particular medium of transporting the coal. If the freshet prevented the plaintiffs from obtaining their coal at the contract-price, they were injured by the act of God. The party, therefore, who binds himself unconditionally in a contract must bear the loss rather than the other, whose duty is merely passive.

A tenant who binds himself to repair must rebuild premises if casually burned down: Chesterfield v. Bolton, Comyns 627 ; Poole v. Archer, Skin. 210 ; Bullock v. Dommitt, 6 T. R. 650 ; McKenzie v. McLeod, 10 Bing. 385 (25 E. C. L. R. 184) ; Commonwealth v. Comly, 3 Barr 372.

The tenant is obliged to pay the rent, although he has lost the enjoyment of the premises: Weigell v. Waters, 6 T. R. 488 ; Izon v. Gorton, 5 Bing. N. C. 501 (35 E. C. L. R. 198) ; Holt zapffell v. Baker, 18 Ves. 115.

If he enter into an express contract, without exception or qualification, he is liable, although the damage may be caused by inevitable accident: Paradine v. Jane, Alleyn 27 ; Smith's Landlord and Tenant Law, ed. 1856, pp. 248, 249, 258 ; Pollard v. Schaffer, 1 Dall. 210 ; Magaw v. Lambert, 3 Barr 444 ; Rowland v. Lehigh C. & N. Co., 4 Casey 215.

C. Guillou, for defendants in error.—The contract is to be construed on the basis of circumstances about which the parties may be reasonably supposed to have contracted, and not others they never thought of: Sch. Nav. Co. v. Moore, 2 Whart. 477–491 : Case v. Cushman, 3 W. & S. 546.

It would be a disgrace to the law if the party whose efforts are paralyzed by the act of God should be held liable for the consequences of that act, or if the act of God did not excuse in man the performance of the act which his fiat has rendered impossible: 1 Coke 98 b ; Hayes v. Bickerstaff, Vaughan's Reports 119, 122 ; Pollard v. Shaffer, 1 Dall. 213 ; Commonwealth v. Comly, 3 Barr 372 ; Co. Lit. 206, a ; People v. Maning, 8 Cow. 297 ; Bradford v. Earle, 4 Pick. 120.

Even carriers are excused where the goods are destroyed by the act of God, without any stipulation in the contract: Coggs v. Bernard, 1 Am. Lead. Cas.; Broom's Legal Maxims 89 ; Williams v. Loyd, W. Jones 179 ; or Williams v. Hide, Palmer 548 ; Carpenter v. Stevens, 12 Wend. 590 ; Baylies v. Fetterplace, 7 Mass. 330 ; Miller v. Phillips, 7 Casey 224 ; Rowland v. Lehigh C. & N. Co., 4 Id. 215.

The opinion of the court was delivered, October 31st 1867, by READ, J.—The Buck Mountain Coal Company was incorporated by an Act of Assembly passed the 16th June 1836, Pamph. L. 803, for the purpose of mining of coal, and for transacting

the usual business of companies engaged in the mining, transporting to market and selling of coal and the other products of coal-mines, and were subsequently authorized to construct a railroad with one or more tracks, to intersect the navigation of the Lehigh Coal and Navigation Company, which they completed in 1840, and established a depot at Rockport, where they broke and prepared their coal, and thence shipped it by the said navigation to market. The Lehigh Coal and Navigation works, therefore, became an indispensable and all-important link in their chain of transportation ; a fact well known to all their customers, as well as the quality of their coal and the mines from which it was taken. Of course all contracts made with the defendants were made in full view of these facts. On the 4th of June 1862 an unprecedented freshet in the river Lehigh swept away all the upper Lehigh Navigation works, which have never been restored above Mauch Chunk, and completely stopped all transportation of coal by the defendants to market.

The loss of life and property on the line of the river by this act of God was very large.

On the 28th May 1862, the defendants contracted to deliver to plaintiffs 4000 tons of their coal at their wharf in Philadelphia, from their mines, in such quantities as the plaintiffs might call for, at the price for the first 1000 tons of $3.43 per ton, the balance, say 3000 tons, at $3.43 per ton, with the addition of any advance in freights and tolls which may take place on or before July 1st 1862, the plaintiffs to pay any tax that may be imposed by the government. Payment to be made on the 1st of each month for the delivery of the preceding month. The coal delivered in the present month (May) to be considered as a portion of the quantity contracted for. The first 1000 tons is settled by the verdict, and the only question is as to damages claimed by the plaintiffs for the non-delivery of the remaining 3000 tons.

The defendants offered within a reasonable time after the freshet, to deliver their coal according to the terms of the contract, but this was declined. All the facts were submitted to the jury under the charge of the court, and the only question is, whether the instructions of the judge were correct.

The delivery of coal was to be at intervals during the period of a year, as it suited the plaintiffs, who had no accommodation for storing it in large quantities. The learned judge, after stating the relations of the parties, says : " If, therefore, the only medium of transporting the coal in quantities, such as would be required in the present contract, was destroyed by an inevitable flood, and the defendants were thereby prevented from fulfilling the contract, they are excused from compliance therewith during the time they were so prevented, but no longer. That the defendants may shelter themselves from liability to damages for non-delivery of

[Lovering *v.* Buck Mountain Coal Co.]

coal during the time after the occurrence of the disaster, and before they were able to resume its performance. Measuring that time by the time of the offer to furnish coal, it was about one month. Was this unreasonable delay?" Certainly not in such a contract, and where the fulfilment to the exact letter was prevented by an act of God, over which they could have no possible control, and which they could not have in any way provided against, as they were not the owners of the navigation works. " When the defendants offered to resume a compliance of their contract, they had a right to insist on advance on freight and tolls, if any advance occurred on or before July 1st 1862, from any cause which they could not control. The agreement to pay advance freight and tolls is general, and it applies to increase by the most usual and ordinary mode. Did an increase occur before the 1st of July ? If it did, and lasted until performance or offer of performance by the defendants, they had a right to demand it."

" The offer to furnish coal, therefore, on the basis of the contract, including the advance freight and tolls, if any existed, was, *if made and refused,* a sufficient compliance on the part of the defendants, and if the plaintiffs did not choose to take coal, the fault is theirs, and they cannot recover damages, if the offer was made in good faith."

This is the whole case before us; and we perceive no error in the rulings of the learned judge, which are very moderate in a case where the act of God should properly leave the parties without any remedy on either side.

In the case of Appleby *v.* Myers, in the Exchequer Chamber on 21st June last, 16 Law Times 669, where the plaintiff contracted with the defendant to supply and put up on the defendant's premises an engine and certain machinery, for which he was to be paid a lump sum on completion; and when a portion of the machinery was put up and fixed, but before the whole was completed, an accidental fire broke out on the defendant's premises, which destroyed the premises and so much of the work as the plaintiff had done upon them, and rendered the further performance of the contract impossible; it was held that the plaintiff was not entitled to recover the whole, nor any portion of the contract price.

" We think," said Justice Blackburn, " that when, as in the present case, the premises are destroyed without fault on either side, it is a misfortune equally affecting both parties, and excusing both from further performance of the contract, but giving a cause of action to neither."

The verdict of the jury effects the same result in this case, and as the plaintiffs have failed in sustaining their specifications of error,

The judgment is affirmed.