West, Appellant *v.* Peoples First National Bank & Trust Company, Appellant.

Argued May 24, 1954.　　Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*William B. Paul,* with him *Theodore M. Burns, Jr.,* and *Paul, Lawrence & Rock,* for plaintiff.

*William S. Moorhead, Jr.* and *Judson A. Crane,* with them *A. W. Henderson* and *Moorhead & Knox,* for defendant.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 28, 1954:

Plaintiff, C. A. West, is engaged in the real estate business and more particularly in the development of large tracts of unimproved land into residential and commercial lots and the sale of the lots so laid out. Defendant, Peoples First National Bank & Trust Company, is the trustee for certain persons known as the "McKelvey heirs" of a tract of 142 acres of land lying east of the Borough of Wilkinsburg in Allegheny County, this land being generally referred to as the "McKelvey tract." Following numerous conferences between plaintiff and defendant's attorney looking to an agreement for its development plaintiff was largely instrumental in obtaining the annexation of the major portion of the tract to the Borough of Wilkinsburg, an annexation which permitted of a much more profitable development of the land.

On April 17, 1941, plaintiff and defendant entered into a written contract which forms the basis of the present controversy. It was entitled an "Agreement of Joint Adventure." Briefly summarized, it provided that plaintiff should have the exclusive right and privilege to enter into possession of the tract, lay out, grade and pave streets, install gas and water mains, electric light facilities and sanitary sewers, develop the land, and market and sell the lots laid out. Plaintiff agreed that he would enter into possession, prepare plans of the property showing proposed streets, grades and lots, procure all necessary permits pertaining to the development and sale of the property, advance all monies necessary to its full development, and advance to defendant sufficient funds to pay the delinquent taxes assessed against the property as well as the currently accruing taxes if defendant at any time during the period of the agreement did not have sufficient funds on hand for that purpose. The agreement provided that the parties were "in no manner whatsoever partners in the enterprise," but that it was merely a "joint adventure." Upon the sale of any parcels of the tract the proceeds were to be applied, first, to the repayment of all monies advanced by plaintiff in the improvement of the land, and, second, to an equal division of the balance between the parties. The agreement was to cease and determine at the end of six years from the date thereof, and plaintiff was thereupon to surrender possession to defendant without claim for any expenses incurred by him; defendant was not to be liable to plaintiff for monies expended by him in the development and improvement of the property but plaintiff was to look exclusively for recoupment to the proceeds theretofore received by him from the sales of lots.

Immediately after the execution of the agreement plaintiff proceeded to carry out his obligations thereunder. He made available to defendant the necessary funds for payments on account of current and delinquent taxes and he and his staff began to make studies of the tract and prepare numerous maps and plans of the area, requiring for such preparation the services of professional engineers and draftsmen. He also collaborated in procuring zoning regulations for the portion of the tract which had been annexed to the Borough of Wilkinsburg, the zoning ordinance providing for both commercial and residential areas. But the joint adventure was ill-starred. World War II began on December 7, 1941, and building restrictions imposed by the federal government made development of the land for the time being practically impossible. Nevertheless plaintiff continued his efforts and prepared maps and studies which he submitted to the Federal Housing Administration in order to interest it in a project for war housing, but this attempt proved abortive.

On October 25, 1943, the parties entered into a second agreement in writing for the purpose of supplementing the earlier one. It provided for the payment of certain tax instalments by plaintiff to be repaid to him from the net proceeds first received by defendant as its share of the proceeds from the sale of real estate. It further provided that the six-year period stipulated in the original agreement should not begin to run until the government modified its then existing regulations and restrictions on building construction, it being the understanding of the parties that defendant should have six years from the date that such modification should occur in which to complete the performance of the original agreement.

But another blow struck the joint adventure. In October, 1946, before any development of the land had actually taken place on the ground, the Commonwealth condemned approximately 26 acres of the McKelvey tract, and in November, 1947, an additional 32 acres, for purposes of a limited access highway with elaborate traffic interchanges. This condemned acreage cut through the very heart of the tract, leaving isolated marginal portions at the corners of the original area. The result was that the original purpose of the joint adventure agreement could not be carried out. Moreover, the work of construction of the highway through the tract, which continued thereafter during the entire term of the agreements, made it impossible to attract purchasers to the property so as to effect sales of the uncondemned portions of the land. Plaintiff, however, persisted in his efforts to make the best of the situation. In November, 1946, he obtained the M. & S. Construction Company as a purchaser, for the sum of approximately $20,000, of a parcel of 17.63 acres on the northeasterly side of the tract, the entire proceeds being received by defendant. He hired a real estate appraiser to make further studies of the tract and the damages resulting from the condemnation. He prepared numerous maps and plans covering the uncondemned portions of the land for studies of street and lot patterns designed to render those portions most productive. Throughout 1948 the parties had frequent conferences discussing the matter of the condemnation proceedings and the award to be received from the Commonwealth and it was agreed that plaintiff's office would prepare the engineering details. In July, 1948, another sale was made to Westinghouse Electric and Manufacturing Corporation of a parcel of some 5½ acres for the sum of $11,000, the proceeds being received by defendant. Meanwhile, as the court

below found, there was no evidence that either party sought to rescind the agreement or had any intention of so doing. The first indication of any such repudiation came at the end of 1948 when, plaintiff having obtained a prospective purchaser for another parcel of the land in the southeasterly corner of the tract for the sum of $23,000, defendant refused to accept the offer unless plaintiff would agree that the joint adventure agreement was no longer in force and that he was therefore not entitled to half the proceeds of the proposed sale. Failing to come to an understanding, and it being desirable to obtain a decision as to the status of the parties under the joint adventure agreement, plaintiff, in September, 1949, instituted the present proceedings for a declaratory judgment. The issues presented were these: Did plaintiff, under the agreement, have any title or interest in the land of the McKelvey tract or only in the profits arising from the sales thereof? Is he entitled to half of the award to be obtained in the condemnation proceedings? Did the condemnation terminate the joint adventure agreement? Was such termination waived by defendant? Is plaintiff entitled to half the proceeds derived from the sales to M. & S. Construction Company and the Westinghouse Corporation? Is he entitled, by way of restitution, to the recovery of expenditures made by him and for the services he rendered so far as defendant was benefited thereby? The condemnation proceedings have for these several years been held in abeyance pending decision as to plaintiff's right to participate therein as a party and the determination of these various other issues arising from the facts and circumstances heretofore stated.

It may be noted at the outset that while a joint adventure is not the same as a partnership, and indeed the agreement between the parties expressly de-

clared that they were not partners in the enterprise, a joint adventure does partake in many ways of the nature of a partnership, the principal difference being that it usually, though not necessarily, applies to a single transaction instead of being formed for the con-  duct of a continuing business: *Bell, Executrix, v. Johnston,* 281 Pa. 57, 59, 126 A. 187, 188.

The principal question in the case is whether the agreement between the parties was automatically terminated by the condemnation of the 58 acres of the tract or whether the conduct of the parties indicated their intention and understanding that the condemnation should not be deemed to have such an effect. Of course, as held under the varying circumstances of many cases,[1] where a contract relates to specific property the existence or maintenance of which is necessary to the carrying out of the purpose of the agreement, the condition is implied by law, just as though it were written into the agreement, that the impossibility of performance or the frustration of purpose arising from the destruction of the property or interference with its use, without the fault of either party, ends all contractual obligations relating to the property. Moreover, impossibility in that connection means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, or loss involved: Rest. Contracts, §454. But in the present instance the property which was the subject matter of the agreement between the parties was not

[1] Examples: *Lovering v. The Buck Mountain Coal Co.,* 54 Pa. 291; *Ward v. Vance,* 93 Pa. 499; *Greenberg v. Sun Shipbuilding Co.,* 277 Pa. 312, 121 A. 63; *Commercial Coal Mining Co. v. Big Bend Coal Mining Co.,* 293 Pa. 39, 141 A. 732; *Greek Catholic Congregation of Olyphant Borough v. Plummer, Executrix,* 338 Pa. 373, 382, 12 A. 2d 435, 439; *Dixon v. Breon,* 22 Pa. Superior Ct. 340; *Wertz v. Klinger,* 25 Pa. Superior Ct. 523.

physically destroyed, nor was the agreement made wholly impossible of at least part performance, although the condemnation undoubtedly worked a grave interference with the project. Under such circumstances, the extent of the devastating effect of the condemnation not being entirely clear, it was for the parties themselves to decide, and to indicate to one another, whether they considered the agreement terminated or whether they desired that such development of the land and sales of parcels thereof as were still possible should be continued. That being so, the facts are that defendant, for the period of at least two years after the first of the condemnations, engaged in conferences with plaintiff regarding its claim for damages against the Commonwealth; both parties negotiated with representatives of the Commonwealth; plaintiff had an appraisal made for use in connection with the condemnation proceedings, paid the taxes on the property up to January 1, 1947, prepared plans for the development of the uncondemned portions of the tract, and effected the sale, previously mentioned, to the M. & S. Construction Company. As the court below aptly said: "All of those acts indicated an intention of the parties to continue to be legally bound under the terms of the agreement." Whether the principle applicable to the situation be properly characterized as one of waiver or estoppel, there can be no question but that defendant, having led plaintiff to continue to render services under the agreement and having accepted the benefits thereof, cannot now be permitted to assert that the contract terminated at the time of the condemnations and was therefore not in force when the sales were made to M. & S. Construction Company and the Westinghouse Corporation. Therefore, in our opinion, the court below properly held that plaintiff was entitled to half the net

proceeds from those two sales.[2] Defendant argues that plaintiff was to share only in the proceeds from sales of *lots,* and not, as in the case of these two sales, of *undeveloped acreage.* There is no merit in this contention because not only had the tract been zoned at the instance of the parties for commercial as well as residential purposes, but in both the original and the supplemental agreement there are several references to the sale of "property" and "real estate" and not only to the sale of "lots." It must have been clearly understood by the parties from the very beginning that parts of the tract would prove unsuitable for residential purposes and would therefore have to be sold as undeveloped acreage for commercial use.

Plaintiff claims that by virtue of the joint adventure agreement he obtained an interest in the land as such and is therefore entitled to participate as a party in the condemnation proceedings and to receive half the proceeds of the award that may be rendered therein. We agree with the court below that this claim is unjustified. Nowhere in the agreement is there any provision or any indication of an intention on the part of defendant to grant to plaintiff any title to, interest in, or lien upon, the land; its only obligation was to account to plaintiff for his share of the net profits. The cases cited by Rowley in his treatise on The Modern Law of Partnership, amply support his statement (vol. 2, p. 1348, §979) that "where one party advances all the money for purchasing the property and the others are to contribute services for a share in the profits, the title to the property is in the one who fur-

---

[2] Since the agreement must be held to have been still in force at that time its provision (Section Third (2)) was applicable that plaintiff should first receive out of the proceeds repayment of moneys advanced by him in the improvement of the land before division of the proceeds between the parties.

nishes the money." Here plaintiff contributed no funds for the purchase of the property which was the subject matter of the agreement; on the contrary, the land had been owned by the McKelveys for over one hundred years. All that the agreement gave to plaintiff was "the exclusive right and privilege to enter into possession of the aforesaid tract of land," which possession he was to surrender at the termination of the agreement. It follows that plaintiff has no status to become a party to the condemnation proceedings. Nor, in our opinion, as the court below held, is he entitled to share in the award to be made in those proceedings. When the agreement provided that he was to receive half the proceeds of the *sale* of the property or any part thereof, it was certainly not in the contemplation of the parties that the term *"sale"* should include in its connotation a condemnation of more than one-third of the entire tract, especially when at the time of the condemnation there had not been any development or improvement of the land whatever. Indeed, if plaintiff were correct in his contention, it would mean that if a condemnation had been made of the *entire* tract immediately after the execution of the agreement between the parties he would have been entitled to a half share of the proceeds, a "reductio ad absurdum" which demonstrates the lack of merit in his position on this issue.

This brings us to the final question in the case, namely, the relief to which plaintiff should be held entitled by reason of the fact that he expended money and performed services under the agreement which was terminated through no fault of his own. Defendant apparently concedes that he is entitled to the recovery, on the principle of restitution, which the court below awarded him. In Williston on Contracts, vol. 6, (rev. ed.) pp. 5536, 5537, §1972, it is said that "If per-

formance on one side or the other of a contract becomes excusably impossible while the transaction is still wholly executory on both sides, . . . not only is the contract discharged but neither party is subject to further obligation of any kind. But where the party excused by impossibility has partly performed the contract on his side before the impossibility arises, . . . justice requires the imposition of a quasi contractual obligation on the party receiving such performance to pay its fair value. . . . Finally, it should be immaterial whether the plaintiff's claim is based on a transfer by him of money, land, goods, labor and materials, or personal services. The basis of his right is in each case the same." See also Restatement, Contracts, §468(1); Restatement, Restitution, §108(c). However, the basis of the doctrine of restitution is the unjust enrichment of one person at the expense of another, and therefore the measure of recovery in such case is limited to the value of the benefit to the other party derived from the performance in advancing the object of the contract, even though the sums expended or the value of the services rendered may be greater than the amount of such benefit conferred. Restatement, Contracts, §468(3); Restatement, Restitution, §155(1) and comment d.

It is defendant's contention that plaintiff should not be allowed what it claims is a double recovery, one by way of restitution and the other the proceeds of the sales to M. & S. Construction Company and the Westinghouse Corporation, the one resting upon the assumption that the agreement was terminated and the other that it continued in force. This argument, however, fails to recognize that the agreement remained in effect, as we have held, until after the two sales in question had been made and until the controversy arose in connection with plaintiff's presentation of an offer for an additional purchase. It was at

that later point that the agreement must be deemed to have been terminated in fact and in law, and at that moment plaintiff's right to restitution sprang into being. In pursuance of that right plaintiff is entitled to recover the moneys expended by him (and not theretofore repaid to him) and also for the value of the services rendered by him during the period of the existence of the agreements, but, as to each of those items, only to the extent of the benefit which accrued therefrom to defendant. The amount of that recovery must be determined in supplementary proceedings as provided in the judgment rendered by the court below.[3]

Judgment affirmed, costs to be divided equally between the parties.

Mr. Justice MUSMANNO dissents.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

West contended he was a partner or a joint adventurer with defendant in a land development. He could at the proper time have brought an action of assumpsit or a bill in equity for an accounting which would have given him adequate redress for whatever he was entitled to. Instead he filed a petition for a declaratory judgment at a time when litigation was not imminent, and a decision would not settle all the main issues or controversies between the parties or even be a practical help in ending the controversy, and where all parties were not or could not be joined.

Unless our prior decisions in this field are to be ignored or overruled, declaratory judgment proceed-

---

[3] The injunction granted by the court below to prevent defendant from petitioning for the appointment of viewers in the condemnation proceedings pending the determination of plaintiff's rights, should now be vacated.

ings will not lie and should be dismissed: *Lifter Estate*, 377 Pa. 227, 228, 103 A. 2d 670; *Eureka Casualty Company v. Henderson*, 371 Pa. 587, 592, 92 A. 2d 551; *Capital Bank & Trust Company's Petition*, 336 Pa. 108, 111, 6 A. 2d 790; *McCandless Township v. Wylie*, 375 Pa. 378, 388, 100 A. 2d 590; *Kariher's Petition (No. 1)*, 284 Pa. 455, 471, 131 A. 265; *Reese v. Adamson*, 297 Pa. 13, 15, 146 A. 262.

In *Lifter Estate*, 377 Pa., supra, we said (pages 228-9): "In Eureka Casualty Co. v. Henderson, 371 Pa. 587, 92 A. 2d 551, Mr. Chief Justice STERN said (pages 591, 592): '. . . whether or not a court will take jurisdiction of a petition for a declaratory judgment or decree is purely a matter of judicial discretion. . . . It was said in Capital Bank and Trust Company's Petition, 336 Pa. 108, 111, 6 A. 2d 790, 792; ". . . the vital factor in the assumption of jurisdiction is the presence of antagonistic claims indicating imminent and inevitable litigation, coupled with a clear manifestation that the declaration sought will be a practical help in ending the controversy: . . ." ' "

"The facts in the instant case bring it within the aforesaid requirements; the problems involved are so unusual and difficult, litigation was so imminent and inevitable, and the peril to the Federation was so great and immediate that we consider this to be an appropriate matter for a declaratory judgment."

In *Sterrett's Estate*, 300 Pa. 116, 150 A. 159, the Court said (page 124): "Moreover, from the Kariher Case down to our latest utterances on the subject of declaratory judgments, in Taylor v. Haverford Twp., 299 Pa. 402, this court has uniformly ruled that relief may not be granted under the Act of June 18, 1923, P. L. 840, where another established remedy is available. . . . As recently said by us in Taylor v. Haverford Twp., supra, 'We are determined that the De-

claratory Judgments Act, an excellent piece of legislation when kept within proper bounds, shall not be used in cases to which it is not properly applicable,' and this is one of them."

In the instant case the majority frankly admit that the rights between these parties, as well as the amount of recovery, if any, must be determined in future or supplementary proceedings.

For these reasons I would hold that declaratory judgment proceedings should be dismissed.