**JONATHAN WOODNER COMPANY, Appellant,**

**v.**

**Steven Z. LAUFER, Appellee.**

**No. 85–1059.**

District of Columbia Court of Appeals.

Argued Jan. 14, 1987.
Decided Sept. 18, 1987.

Waldemar J. Pflepsen, Jr., with whom Robert F. Condon, Washington, D.C., was on the brief, for appellant.

Steven Sarfatti, with whom Charles R. Donnenfeld and David N. Yellen, Washington, D.C., were on the brief, for appellee.

Before TERRY and STEADMAN, Associate Judges, and NEBEKER, Associate Judge, Retired.[*]

TERRY, Associate Judge:

This litigation resulted from the parties' failed real estate development project, each party claiming breach of contract. The trial court, after a non-jury trial, found that timely completion of the project was rendered impossible by unanticipated changes in the District of Columbia's condominium conversion laws, so that there was no breach of contract, and neither party was entitled to damages. However, appellee Laufer, who had rendered services to convert appellant's apartment building into condominia, was awarded $100,000 under the doctrine of quantum meruit, plus $44,076.45 as reimbursement for his out-of-pocket expenses. Because the trial court failed to make a critical finding of fact, we vacate the judgment and remand the case for further proceedings.

I

The Jonathan Woodner Company (JWC) is a corporation specializing in real estate development and management. Headquartered in New York, JWC owns property in several cities in the eastern United States. One of the many JWC properties in the District of Columbia is the Park Towers, an apartment building on 16th Street, N.W.

During the 1970s the Park Towers fell into a state of disrepair, and in 1978 JWC decided to undertake a major rehabilitation of the building. Ian Woodner, JWC's president, assigned the rehabilitation project to his son Jonathan, a vice president of JWC. Being a newcomer to the real estate business, Jonathan Woodner decided to find a partner to facilitate the Park Towers project. With his father's approval, he sought out appellee Laufer, who holds a doctorate in economics and is an experienced real estate developer.

When Jonathan Woodner told Laufer of JWC's plans to rehabilitate the Park Towers apartments as rental property, Laufer suggested instead that the building be converted into condominia. Laufer, who had successfully handled several condominium conversion projects in the Washington area, believed that a similar conversion of Park Towers would yield higher profits. Jonathan Woodner, impressed by Laufer's credentials, was persuaded to convert Park Towers into condominia, and the two men began to negotiate the terms of a development agreement.

In the meantime, the District of Columbia Council, in an effort to alleviate an acute shortage of rental housing, had imposed a moratorium on condominium conversions throughout the city of Washington.[1] Certain conversion projects, however, were exempted from the moratorium, including some that Laufer had completed. A conversion could take place, despite the moratorium, if either (1) a majority of the tenants consented, or (2) the building was less than fifty percent occupied, and title to the property was transferred to a cooperative association. After obtaining a legal opinion from Mark Griffin, an experienced real estate attorney, Laufer and Jonathan Woodner concluded that the Park Towers conversion project could qualify under either of these exceptions.

---

[*] Judge Nebeker was an Associate Judge of this court at the time of oral argument. His status changed to Associate Judge, Retired, on September 1, 1987.

1. *See District of Columbia v. Washington Home Ownership Council,* 415 A.2d 1349 (D.C.1980) (en banc).

As the terms of the development agreement began to crystallize, Jonathan Woodner, Ian Woodner, Laufer, and two other JWC officials met in New York in June 1979 to discuss the details of the project. Finally, on July 26, the parties executed two written contracts. The first provided for the formation of the New Park Towers Associates (NPT), a general partnership between Laufer' and Jonathan Woodner. NPT's function was to rehabilitate the Park Towers apartments and convert them into condominia. Under the contract Laufer was appointed managing partner of NPT.

The second contract, from which this litigation arises, set forth the development agreement between NPT and JWC. This contract recited various services to be provided by NPT and also gave NPT the authority to do everything necessary to complete the project. JWC, on the other hand, was to provide the property itself. In addition, the second contract provided that when the project was completed, the building would be sold and the proceeds divided between NPT and JWC. From an assumed gross sales price of $6,750,000, JWC was to receive $1,750,000 off the top; the remaining $5,000,000 was to be used for paying all expenses incurred during the project, with NPT receiving any funds left over. If the sales price exceeded $6,750,000, one-third of the excess would go to JWC and two-thirds to NPT. JWC also agreed to the creation of a first mortgage lien on the property as security for a construction loan; furthermore, to secure NPT as the guarantor of the construction loan, JWC agreed to the creation of a second mortgage lien. Conspicuously absent from this contract was any timetable for completion of the project.

NPT then sought and obtained a commitment from Riggs National Bank for a $3,850,000 construction loan.[2] Laufer, on behalf of NPT, also secured "end-loan financing," *i.e.,* a commitment from a mortgage company to provide mortgage loan financing to the purchasers of the new condominium units after completion of the rehabilitation project. In addition, NPT relocated existing tenants, rehabilitated vacant units, and performed basic managerial functions for the property. Since the construction loan was not yet available, both Laufer and Jonathan Woodner advanced some of their own funds for these activities, even though they had not contemplated making any personal loans to the partnership or contributing any capital of their own to finance the project.

During the ensuing weeks, with the aid of NPT, a majority of the Park Towers tenants found other places to live, so that by October 1979 the building was less than fifty percent occupied. On October 4 Mark Griffin, the attorney for the project, filed an application with the District of Columbia Department of Housing and Community Development (DHCD) to convert the Park Towers apartments to cooperative status. On November 30 Griffin filed a second application to convert the apartments into condominia, supported by documents showing that more than seventy percent of the tenants in residence as of November 1 had consented to the conversion.

The parties' quest for fortune began to go awry when DHCD failed to act on either of the applications submitted by Mr. Griffin. He continued to press for approval of the applications, however, and a hearing was finally held in June 1980. In the interim, as more tenants were relocated, the ones who stayed behind worked to derail the project. By the time of the hearing, the remaining tenants had joined together to oppose the conversion and had obtained legal counsel.

Meanwhile, the District of Columbia Council had enacted new legislation governing the conversion of apartments into condominia.[3] Because the new law was to take effect on August 1, 1980, DHCD did

---

2. The documents submitted to the bank in support of the loan application included a copy of Mr. Griffin's legal opinion that the conversion project would qualify under either of the two exceptions to the moratorium.

3. D.C.Code §§ 45–1601 through 45–1663 (1981).

not render any decision at the June hearing, even though NPT argued that its applications, which were filed before August 1, should be considered under the prior law. In October DHCD ruled not only that the new law applied, but also that it barred further consideration of NPT's applications.[4]

NPT's inability to secure DHCD's approval of the conversion applications proved to be disastrous. Dissatisfied with NPT's performance, Ian Woodner proposed certain modifications in the original agreement between JWC and NPT. The parties also discussed the possibility of JWC's purchase of Laufer's interest in the project.[5] But these efforts to save the JWC–NPT alliance were fruitless. In March 1981 Ian Woodner, in a letter written as president of JWC, terminated the JWC–NPT development agreement, claiming that NPT had breached its obligations. All rights and liabilities of NPT in the conversion project were thereafter transferred to JWC.

By this time Laufer had used a substantial amount of his own personal funds to help finance some of the project's activities. Riggs Bank had advanced only a small fraction of the construction loan, since the majority of the loan proceeds would not be disbursed until DHCD approved NPT's applications. Jonathan Woodner and Laufer had intended the Riggs loan to cover all expenses. However, since the bulk of the loan was never distributed, Laufer incurred out-of-pocket expenses totaling $44,076.45.

Shortly after the development agreement was rescinded, Laufer filed this action against JWC. In his complaint Laufer sought damages for JWC's allegedly wrongful termination of the contract, quantum meruit damages based on the value of his services on behalf of the partnership in renovating the apartment building, and indemnification of all liabilities which he had incurred on behalf of JWC in connection with the Park Towers project. Along with its answer, JWC filed a counterclaim for breach of the development agreement, based on Laufer's failure to complete the project. A few months later Laufer filed an amended complaint, adding a claim for a constructive trust to be imposed on the proceeds of any sale of the property by JWC.

The trial court, after hearing the evidence and reviewing the JWC–NPT contract, decided to imply a term "requiring performance within a reasonable time." It then ruled that the contract had been "discharged by a supervening impossibility," namely, the refusal of DHCD to act on the applications for conversion of the Park Towers to condominia. It therefore held that neither Laufer nor JWC was entitled to any damages for breach of contract, and dismissed both Laufer's claim for such damages and JWC's counterclaim. However, the court awarded Laufer $100,000 in quantum meruit damages, relying on Jonathan Woodner's valuation of Laufer's services (see note 5, *supra*). Finally, the court held that Laufer should be reimbursed for his out-of-pocket expenses of $44,076.45, even though it made no finding that any of these expenses were reasonable, relying solely on "equity" in ordering reimbursement. No ruling was made on the claim for a constructive trust. From the trial court's judgment JWC brings this appeal.[6]

## II

■ JWC maintains that it and Laufer formed a joint venture, and that this rela-

4. Under the new legislation, condominium conversions had to be approved by a tenant election. D.C.Code § 45–1612 (1981). The remaining tenants at Park Towers, however, were engaged in a rent strike against NPT and opposed a conversion, so that any attempt to convert Park Towers would have been defeated if put to a vote of the tenants. Consequently, JWC filed possessory actions against the rent-striking tenants in the Landlord and Tenant Branch of the Superior Court, based on the tenants' failure to allow the landlord access to their apartments as required by their lease agreements. Judgments of possession were eventually obtained against all the tenants except one who had not been properly served with a notice to quit.

5. In the course of these negotiations, Jonathan Woodner told his father that Laufer had provided services to the partnership worth $100,000 to $120,000. Portions of his deposition to that effect were introduced into evidence at trial.

6. Laufer has not filed a cross-appeal.

tionship precluded Laufer from recovering any damages on a theory of quantum meruit. The trial court, however, did not resolve the issue of whether a joint venture existed. We hold that this omission was fatal to its decision, and that a remand is necessary to cure the error.

The trial court did find that during the initial discussions in New York between Laufer and JWC in June 1979 "it was preliminarily agreed that the conversion project would be a joint venture between [JWC] and a partnership [NPT] to be formed between Dr. Laufer and Jonathan Woodner." JWC now argues that this finding is tantamount to saying that a joint venture was formed. We cannot agree, because the court also found "that the discussions in New York were preliminary in character and the parties intended that *any binding agreement to be entered into would be in writing.*" Finding of Fact No. 10 (emphasis added). When discussing the actual written agreement between JWC and NPT, the trial court made no finding at all on the issue of whether a joint venture had been created.

Ironically, Laufer himself argued below that he and JWC had formed a joint venture, and that JWC had violated the venture agreement by breaching its fiduciary duties. But when the trial court concluded that performance of the JWC–NPT contract was impossible, so that neither party could recover damages for its breach, Laufer's argument went unaddressed. JWC, on the other hand, had no reason to assert that a joint venture had been formed. As JWC explains in its reply brief, Laufer maintained that he was entitled to quantum meruit damages because of JWC's alleged

breach of contract. He never argued for this remedy simply because the JWC–NPT contract was impossible to perform; instead, he asserted his claim of intervening impossibility only as a defense to JWC's counterclaim for breach of contract. Thus the trial court was never squarely presented with the issue of whether JWC and NPT were joint venturers.

 Nevertheless, we hold that this issue must be resolved, because the merits of Laufer's quantum meruit claim depend on its resolution. If there was a joint venture, then Laufer was not entitled to quantum meruit damages. If a joint venture never came into existence, then Laufer may be able to recover in quantum meruit, but only if he presents more proof of the value of his services than he has offered so far. The existence *vel non* of a joint venture is a factual issue properly reserved for the trial court as trier of fact; we may not decide it for the first time on appeal. *See, e.g., Bank of California v. Connolly,* 36 Cal.App.3d 350, 364, 111 Cal.Rptr. 468, 478 (1973); *Shinn v. Edwin Yee, Ltd.,* 57 Haw. 215, 218, 553 P.2d 733, 737 (1976); *see also Tartaro v. La Conte,* 157 Conn. 583, 584, 254 A.2d 912, 913 (1969); *Widdoss v. Donahue,* 331 N.W.2d 831, 833 (S.D.1983); *Fuller v. Fuller,* 518 S.W.2d 250, 251 (Tex.Civ. App.1974).[7] We must therefore remand the case to the trial court for it to make the necessary finding.

### A

 Assuming that, on remand, the trial court finds that JWC and NPT were

---

7. Although the *Tartaro, Widdoss,* and *Fuller* cases involve partnerships rather than joint ventures, they are nevertheless relevant here because the rights and liabilities of joint venturers among themselves are generally governed by the laws of partnership. Strictly speaking, a joint venture is not the same as a partnership, but there is "very little law ... applicable to one that does not apply to the other." 46 AM.JUR.2D *Joint Ventures* § 4, at 25 (1969). Principles of partnership law, in particular the Uniform Partnership Act, apply in most instances to joint ventures. *See, e.g., Bank of California v. Connolly, supra,* 36 Cal.App.3d at 371–372, 111 Cal.

Rptr. at 483; *Shinn v. Edwin Yee, Ltd., supra,* 57 Haw. at 517, 553 P.2d at 736; *see also Federal Deposit Insurance Corp. v. Braemoor Associates,* 686 F.2d 550, 556 (7th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983); *Bachewicz v. American Nat'l Bank & Trust Co.,* 111 Ill.2d 444, 447, 95 Ill.Dec. 827, 829, 490 N.E.2d 680, 682 (1986). The only noteworthy distinction, for the purposes of this case, between a joint venture and a partnership is that a partnership is ongoing, whereas a joint venture is usually limited to a single transaction. *Travis v. St. John,* 176 Conn. 69, 70, 404 A.2d 885, 887 (1978).

joint venturers,[8] it should then determine the legal effect of DHCD's delay in processing the conversion applications. If the court adheres to its earlier ruling that this delay made performance of the contract impossible—a ruling not contested on this appeal—it must then conclude that the venture was dissolved.[9] The procedures for winding up a joint venture are—absent any written agreement to the contrary—governed by the pertinent sections of the Uniform Partnership Act (UPA), D.C.Code §§ 41–101 through 41–142 (1986). *See Bank of California v. Connolly, supra,* 36 Cal.App.3d at 371–372, 111 Cal.Rptr. at 483 ("Statutory provisions governing the rights of partners upon dissolution of a partnership are applicable to joint venturers" (citation omitted)); *Booth v. Wilson,* 339 S.W.2d 388, 391 (Tex.Civ.App.1960) (same); 46 Am.Jur.2d *Joint Ventures* § 30, at 51 (1969). The development agreement between JWC and NPT provided for the division of profits, based on the assumption that the conversion project would succeed. But it did not state how assets would be distributed if the project failed; hence the UPA controls. Accordingly, if the trial court finds on remand that a joint venture existed, it must then determine the rights of the parties under the UPA. *See Stoutt v. Ridgway,* 9 Ark.App. 315, 316, 658 S.W.2d 420, 421 (1983).[10]

■ One result of that determination will necessarily be the rejection of Laufer's quantum meruit claims. D.C.Code § 41–117(6) states:

> No partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs.

The effect of this provision is to foreclose Laufer's entitlement to quantum meruit damages, assuming that the court finds there was a joint venture. *See Sharp v. Laubersheimer,* 347 N.W.2d 268, 271 (Minn.1984) (no quantum meruit for joint venturer upon dissolution, citing UPA); 46 Am.Jur.2d *Joint Ventures* § 37, at 56 (1969).

Laufer relies on *West v. Peoples First Nat'l Bank & Trust Co.,* 378 Pa. 275, 106 A.2d 427 (1954), for the proposition that a joint venturer can recover under quantum meruit when the objective of the venture becomes impossible to achieve. Even if we were bound to follow *West,* which we are not, it is distinguishable on its facts. *West* involved a joint venture which was set up to convert unimproved acreage into a residential and commercial real estate development. One co-venturer supplied the property, while the other developed the land, essentially as in this case. But the similarity ends there. When a substantial portion of the property was condemned by the state for the construction of a highway, both joint venturers agreed that the project was to continue with respect to the uncondemned remainder. Some time later the developer proposed to sell a portion of the uncondemned property, but the owner—his co-venturer—refused to cooperate. Consequently, the court held that the developer could recover damages on a theory of quantum meruit for the value of services rendered by him to the property owner.

The court in *West* did not hold, as JWC contends, that the developer was entitled to quantum meruit recovery based on the impossibility of the joint venture. Although there was dictum that a joint venturer

---

8. "Two or more persons who join in a particular business enterprise for profit, as in the purchase, development and sale of real estate, create a joint adventure or venture." *Libby v. L.J. Corp.,* 101 U.S.App.D.C. 87, 90, 247 F.2d 78, 81 (1957) (citations omitted). We note that both Laufer and Ian Woodner testified that the JWC–NPT contract formed a joint venture.

9. A *joint* venture is dissolved when completion of its objectives becomes impossible. *See* C.J.S. *Partnership* § 343 (1950 & 1986 Supp.), citing,

*e.g., Ghertner v. Lipton,* 563 S.W.2d 531, 533 n. 1 (Mo.Ct.App.1978) (partnership dissolved when purchase option expired); Comment, *The Joint Venture: Problem Child of Partnership,* 38 Calif. L.Rev. 860, 868 (1950) (joint venture to be dissolved when realization of its goal is impossible).

10. D.C.Code § 41–139, in particular, sets forth in some detail the manner in which partnership assets are to be distributed when the partnership is dissolved.

would be so entitled if there were an impossibility, the actual holding was that the venture was never terminated because of impossibility; after the condemnation, the parties agreed to continue the project by developing the uncondemned portion of the land. Thus the developer's right to restitution arose only when the property owner refused to sell a parcel to a prospective purchaser. *Id.* at 284, 106 A.2d at 433. That is simply not the situation in the case at bar.

### B

 Alternatively, we must consider what may happen to Laufer's quantum meruit claim if the trial court finds that there was no joint venture. To prevail on this claim, Laufer must show, *inter alia*, that he rendered "valuable services" to JWC. *In re Rich*, 337 A.2d 764, 766 (D.C.1975). As part of this showing, he must present proof of the reasonable value of the services rendered in advancing the purposes of JWC. "The proof of this element is essential to a recovery upon the theory of quantum meruit whenever, as here, the recipient of the service is no more at fault than the claimant." *TVL Associates v. A & M Construction Corp.*, 474 A.2d 156, 159 (D.C. 1984) (citations omitted).[11] From the record before us, we conclude that Laufer presented no competent evidence of the value of his services.

 The trial court noted in its conclusions of law that Laufer himself did not testify on this issue.[12] Laufer did testify that he and Jonathan Woodner performed services worth $1 million to $1.25 million. This estimate, however, was based not on the reasonable value of the services but simply on Laufer's "experience." The trial court apparently decided that this testimony was not evidence of the reasonable value of Laufer's services. We see no error in that decision.

The only evidence on which the court relied in awarding $100,000 to Laufer for his services was Jonathan Woodner's deposition testimony that those services were worth between $100,000 and $120,000. There are two weaknesses in this evidence. First, Jonathan Woodner had no real qualifications to ascertain the reasonable value of Laufer's services. Before the Park Towers project, Jonathan Woodner had been engaged in a profession far removed from real estate, which he left only because his father "drafted" him into the real estate business. Second, and more importantly, Jonathan Woodner never estimated the *market* value of Laufer's services. The $100,000-to-$120,000 figure was an arbitrary number chosen by him to effect a compromise between his father and Laufer in their dispute over the progress of the development project. Given the close scrutiny which we must give to the evidence supporting a quantum meruit award when neither party is at fault, *see TVL Associates, supra*, 474 A.2d at 159–160, we conclude that Jonathan Woodner's testimony was not competent to prove the value of Laufer's services.

Ordinarily that would be the end of the matter. We would hold that there was insufficient evidence to support the award of $100,000 and reverse the judgment in Laufer's favor. In this case, however, we think it best merely to vacate the award, since we are already ordering a remand for other reasons. If the trial court, on remand, finds that there was no joint ven-

---

11. The fact that the development agreement could not be completed because of impossibility would not preclude quantum meruit recovery for services rendered before the impossibility occurred. For example, if a builder is hired to repair or improve an existing home, but the home is destroyed by fire before the work is completed, the builder is entitled to be paid for the quantum meruit value of his or her services rendered before the fire. *Kaufman v. Gray*, 135 A.2d 455, 456 (D.C.Mun.App.1957); *see also Bell v. Carver*, 245 Ark. 31, 33, 431 S.W.2d 452, 453 (1968).

12. Unless the reasonable value of a claimant's services are a matter of common knowledge, *see In re Estate of Enger*, 616 S.W.2d 137, 138 (Mo. Ct.App.1981), there must be some probative evidence on the issue of value. The claimant is generally deemed competent to testify as to the value of his or her own services. *See* Annot., 5 A.L.R.3d 947 (1966). If the claimant does not testify, however, value is usually proven through the testimony of an expert. There was no such expert testimony in this case.

ture, we deem it "just in the circumstances"[13] to authorize the court, in its discretion, to receive additional evidence—if it chooses to do so—on the value of Laufer's services and decide the matter *de novo*.

### III

■ There remains for our review the award of $44,076.45 as reimbursement for Laufer's out-of-pocket expenses. Regardless of whether there was or was not a joint venture, Laufer was obliged to prove, and the court was obliged to find, that these expenses were reasonable. Because the court made no such finding, we direct it to do so on remand.

■ If the court finds that there was a joint venture, then Laufer is entitled to be reimbursed for "payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of [the joint venture's] business or for the preservation of its business or property," D.C.Code § 41–117(2) (1981), provided that the development agreement between Laufer and JWC does not state otherwise. On remand, therefore, the court shall first determine whether there is anything in the agreement that would prevent reimbursement under section 41–117(2); if there is not, the court shall enter judgment in Laufer's favor, under applicable principles of partnership or joint venture law, for all expenditures which meet this standard. If the court does not find that a joint venture existed, it must still determine whether Laufer's expenditures were reasonable. A party who has incurred expenses for another's benefit is entitled to restitution under a theory of quantum meruit. *See* 66 AM. JUR.2D *Restitution and Implied Contracts* § 66, at 1096 (1973); 98 C.J.S. *Work and Labor* § 67 (1957). However, the claimant may recover only those expenses which are reasonable, and he must prove their reasonableness. *See Hawkins v. League*, 398 So.2d 232, 235 (Ala.1981); *Midwest Fabrication, Inc. v. Woodex, Inc.*, 40 Ore.App. 675, 680, 596 P.2d 581, 584 (1979).

In all likelihood, the trial court on remand can probably determine from the existing record whether the expenses claimed by Laufer were reasonable. However, in the event that it cannot, we leave it to the trial court, in its discretion, to decide whether to reopen the record and receive additional evidence on the issue of reasonableness.

### IV

The judgment of the Superior Court is vacated. This case is remanded to that court for the entry of factual findings on the issue of whether a joint venture was created by the development agreement, and for further proceedings thereafter consistent with this opinion.

*Vacated and remanded.*