ROBERTSON et al. v. CARVEY et ux.

No. C–681.

District Court of Alaska. Third Division. Cordova.
March 22, 1939.

Walter H. Hodge, of Cordova, for plaintiff.
Thos. M. Donohoe, of Cordova, for defendants.

HELLENTHAL, District Judge.

This matter is before the Court upon defendants' motion asking that the verdict of the jury, dated October 8, 1938, be set aside and a new trial granted to the defendants for causes materially affecting the substantial rights of the defendants. The first cause assigned why the verdict should be set aside and a new trial granted is for the insufficiency of the evidence. Whereafter the reasons for the same are set forth in detail. The second reason assigned why the verdict should be set aside and a new trial granted is for errors of law occurring at the trial and excepted to by the defendants; and the motion thereafter sets up the said errors in detail. Said motion further requests that the Court require the plaintiffs, as a condition of denying such motion for new trial, to file a remittitur in the amount of $4,000, based upon the commission of 20% of $20,000, which was not paid nor received by the defendants.

This cause came on for trial on the 5th day of October, 1938, upon the complaint, answer and reply herein. In the complaint it is alleged that the defendants are the owners of a majority of the capital stock of the El Primero Mining and Milling Company, which company owns the Granite Mine, located at Port Wells, Alaska, and owns the appurtenances used therewith and that the defendant, Lewis H. Carvey, at all times mentioned therein has been the president of the said El Primero Mining and Milling Company and has personally managed and conducted the operations of said mine; that in October, 1933, the said Mining Company and the defendants were in need of funds with which to open up and carry on mining operations upon the said property; at which time defendant Lewis H. Carvey, acting for himself and his wife, entered into an oral contract with the plaintiffs, whereby it was agreed that in the event the plaintiffs secured from a third party or parties a loan of not to exceed $30,000, the defendants would pay to the plaintiffs,

as compensation for their services in securing such loan, an amount equal to 20% of such amount as the plaintiffs might procure as a loan; that as an inducement to the lender, the loan should be repaid from a redemption fund to consist of 50% of the net bullion and concentrate returns of the Granite Mine; that the term "net bullion and concentrate returns" has a fixed definition in mining terminology as the gross returns from ore or bullion delivered to the smelter or assay office, less only the deduction of charges due the smelter or assay office, said definition being fully understood and agreed to by said Carvey at the time of said oral agreement; that as an additional inducement to a third party or parties to make said loan, the defendants would execute and deliver to one of the plaintiffs herein a written option contract for the purchase of all of the capital stock of the El Primero Mining and Milling Company, which option should be assignable to any party or parties from which the loan was procured; that thereafter on the 27th day of October, 1933, the defendant Lewis H. Carvey executed and delivered to the plaintiff R. G. Amidon, a written option contract, which is as follows:

"Exhibit 'A'

"Option

"This Option Agreement, made this 27th day of October, A. D. 1933, between L. H. Carvey, optioner, and R. G. Amidon, optionee, witnesseth:

"Whereas, optionor is the owner of all of the capital stock of El Primero Mining and Milling Co., an Alaska corporation, which is the owner of a certain mining property in Prince William Sound, Alaska, known as the Granite Mine; and

"Whereas, optionee is desirous of purchasing said stock and optionor is willing to grant to optionee an option to purchase same; now, therefore, it is hereby agreed as follows:

**492**

"1. Optionor hereby grants to optionee the right to purchase all of the capital stock of El Primero Mining & Milling Co. for the agreed price of $125,000.00, same being at the rate of fifty cents per share, this option to expire on November 15th, 1933, unless optionee shall perform the following conditions:

"2. Optionee shall, on or before November 15th, 1933, pay to the optionor the sum of $30,000.00 which optionor agrees to use for the purpose of operating said Granite Mine and for no other purpose, it being the intention that said fund shall be expended for the purchase of necessary supplies, tools, pay-roll and any other proper expenses necessary or convenient to operate said mine. Upon payment by optionee to optionor of said $30,000.00, optionor agrees to cause to be issued to optionee, by El Primero Mining & Milling Co., one or more ore notes dated November 15th, 1933, payable on or before two years from date thereafter, said note or notes to be of the following tenor and effect:

" 'For value received, the undersigned, an Alaska corporation, promises to pay to the order of —————— on or before November 15th, 1935, out of a redemption fund to be created by the segregation of fifty per cent (50%) of the net bullion and concentrate returns of the Granite Mine in the Prince William Sound District of Alaska, U.S.A., the sum of —————— Dollars ($———) with interest thereon at the rate of six per cent. (6%)

" 'The undersigned agrees that this note, and others of like character, tenor and effect, shall be a prior lien upon and a preferred claim against said retirement fund, which, by resolution of the trustees of the undersigned corporation, shall be immediately established; that the holder hereof shall, upon request, be entitled to receive quarterly, a statement showing ore returns of said Granite Mine and the net proceeds of the operations.

" 'El Primero Mining & Milling Co.' "

"3. Upon performance by optionee of the provisions of paragraph two above, optionor agrees to place in es-

crow with Pacific National Bank, Seattle, Washington, all of the capital stock of El Primero Mining & Milling Co., with appropriate escrow instructions to said escrow agent to issue and deliver to optionee, or his appointees, said stock properly endorsed, at the rate of fifty cents per share upon payment by optionee therefor, until there has been paid for forty-nine per cent. of said capital stock, the remainder of said stock to be held by said escrow agent until full payment by optionee of the remaining fifty-one per cent. thereof. It is understood and agreed that payment for said remaining fifty-one per cent. (51%) shall be made on or before November 15th, 1934. Funds received by said escrow agent for said stock shall be placed to optionor's account in Pacific National Bank, Seattle, Washington.

"In witness whereof, the parties have hereunto set their hands and seals at Seattle, Washington, the day and year in this option agreement first above written.

"L. H. Carvey
"Optionor.
"R. G. Amidon
"Optionee.

That the defendant Lewis H. Carvey, acting on his own behalf and on the behalf of the other defendant, made certain material representations concerning the company, with the intent and purpose that the plaintiffs, in negotiating for the loan, could and should make said representations, on behalf of and with the authority of the defendants.

That pursuant to said representations and said oral agreement the plaintiff went to New York for the purpose of obtaining such loan and as a result of the plaintiff's efforts, Irving W. Bonbright became interested in the proposed loan; that the plaintiff R. G. Amidon in negotiating said loan represented to the said Bonbright all the representations made by the defendant, relying upon the truth and integrity of the said defendant, Lewis H.

Carvey; that thereafter said Bonbright exchanged telegrams and held a telephone conversation with the defendant Carvey, in which said telephone conversation the said Carvey repeated the representations previously made in substance, and thereafter the said Bonbright furnished the defendant Carvey the sum of $10,000; and it was agreed that the written option agreement should be extended to December 27, 1933, so that the said Bonbright could cause an expert examination of the said Granite Mine to be made; that at all times prior to said Bonbright's discovery of the falsity of the representations made on the authority of and by the defendant Lewis H. Carvey, said Bonbright was ready, able and willing to advance the additional $20,000 as agreed; that following the advance of the $10,000, said Bonbright employed a competent engineer who examined the mine and equipment and made inquiries as to the truth of the representations made; that as a result of said inquiries, the said Bonbright discovered that the said representations were false and misleading; that Carvey stated that he would not carry out the provisions of the option agreement (Exhibit A), but that he intended to deduct from the net bullion and concentrate returns all operating expenses of the Granite Mine before setting up the redemption fund provided for in said Exhibit "A"; that the said Bonbright upon the discovery of the false representations made and upon the repudiation by the defendant Carvey of the terms of the Option Agreement, refused to make any further advances and demanded the return of the $10,000 theretofore advanced; that the sole reason for the refusal of said Irving W. Bonbright to advance the additional $20,-000 was his discovery of the false and fraudulent representations and the refusal, as aforesaid, of the defendant to perform the terms of the Option Agreement.

The defendants, in their answer, admit the entering into of the contract, admit receiving the $10,000, admit making the extension, deny that any fraudulent representations were made, deny that the defendants refused

to perform the contract, and all other material allegations, and affirmatively plead certain matters as to the ownership of the stock, and plead that no commission was to be paid unless the full amount of $30,000 was secured, and that the payments were to be made not in money but in ore notes; and that the plaintiffs failed to procure a loan of $30,000; that a mining engineer examined the mining property and after inspection expressed complete satisfaction with the said property and that thereafter Bonbright requested defendants to consent to a modification of the said Option Agreement, Exhibit "A" by striking therefrom the words "net bullion and concentrate returns" and substituting therefor the words "gross concentrate returns." That defendants refused to consent to such modification; that defendants have performed the terms and conditions of the agreement and were ready and willing to consummate said agreement until Bonbright rescinded said agreement.

The plaintiffs in their reply deny the affirmative averments of the defense.

■ The first matter to be considered is whether or not the evidence justifies the verdict. It is unquestionably the law that if the plaintiffs, who were brokers, procured a party who was ready, able and willing to comply with the loan agreement, then, and in that event, the plaintiffs would be entitled to their full commission. Dotson v. Milliken, 209 U.S. 237, 28 S.Ct. 489, 52 L.Ed. 768; 8 Am.Jur. 1090; 9 C.J. pp. 598, 599, §§ 87, 88, 12 C.J.S., Brokers, p. 192, § 85; 9 C.J. pp. 623–625, § 102, 12 C.J. S., Brokers, pp. 221, 222, § 95; Freeman v. Kinston Mfg. Co., 4 Cir., 233 F. 58; Baldwin v. Jardine Matheson & Co., 2 Cir., 261 F. 861.

The question is whether under the pleadings and the evidence in this case there was evidence under which the jury could find that Bonbright, the person who was to advance the money, was willing to advance said money in ac-

cordance with the terms of said contract. Under the evidence in the case, Bonbright was able to comply with the said contract.

The agreement he entered into at the time of advancing the $10,000 was conditioned upon the examination of the property and therefore was not sufficient. His testimony as to his willingness after the examination is set forth in his deposition, which is as follows:

"Q.31. If these representations had been correct would you have been able and willing to pay to Mr. Carvey the balance of the $30,000? A.31. If the representations made by Mr. Carvey as to the amount and value of the ore blocked out in the Granite Mine had been found to be correct and had he agreed that the term 'net smelter returns' should mean the amount paid by the smelter after they had deducted any transportation charges paid by them, as well as the usual smelting charges, then I would have been willing to pay Mr. Carvey the further $20,000. I was amply able to make that payment."

"Q.34. Did Mr. Carvey repudiate the provisions of the option contract relative to the repayment of the loan advanced by you? A.34. Yes, he did.

"Q.35. If so, what was the nature of his repudiation? A.35. Carvey had stated that he was the owner of all of the stock of El Primero Mining and Milling Company; which we found to be untrue. He stated that the ore in sight in the mine was more than sufficient to assure repayment to me of $10,000 which I paid and also $20,000 additional payment contemplated by the terms of the option; also untrue. And he refused to recognize the established meaning of the term 'net smelter returns.'

"Q.36. Please state whether or not your refusal to advance the balance of the $30,000.00 was due to his repudiation and the falsity of the representations made to you? A.36. Yes, those were the reasons why I did not advance the balance of the $30,000."

Mr. Mathews, in his deposition, after testifying that upon the request of Bonbright he had turned over the records to Mr. Jones, a Seattle lawyer, who was acting for Mr. Bonbright, testified as follows (Page 10):

"Q. Now, will you go ahead and state the substance of that conversation? What was said by anybody taking part in the conversation? A. Mr. Jones had made an appointment to meet Mr. Carvey and myself in my office, stated that he wanted to talk to us about the option agreement. Pursuant to that appointment, he and Mr. Norsworthy came to the office. I was introduced to Mr. Norsworthy, advised that he had examined the property. I was advised by Mr. Jones and Mr. Norsworthy that they were ready to consummate the deal, pay the additional $20,000 into the Pacific National Bank on the following day, provided Mr. Carvey would agree to making one change in the option agreement dated the 27th day of October, 1933. Mr. Jones stated that the option agreement provided that ore notes were to be given for the $30,000 and these notes were to be paid out of a redemption fund to be created by the segregation of 50% of the net bullion returns of the granite mine. Mr. Jones wanted the word 'net' changed to 'gross'. Mr. Carvey was unwilling to change the wording of the option agreement and so stated at the time. Mr. Jones then stated that unless Mr. Carvey would agree to that change that they were not going to go through with the deal, that they had heard of a rumor of some trespasses on adjoining property and that they would not put the $20,000 in the bank and they would bring a suit against Carvey for everything they could think of to recover back the $10,000 that had already been paid. There was considerable discussion as to why they wanted the terminology changed. Mr. Jones contending that the term was ambiguous and didn't accurately express what the parties had in mind.

"We said that there was no occasion to change the written agreement, that we were willing to put the ore notes

in the bank prepared exactly in accordance with the terms of the option and that if the term net bullion and concentrate returns meant what they contended it meant then we would comply with it but we weren't willing to change the word 'net' to 'gross'. I also told Mr. Jones that I thought his threat to bring a suit in connection with this rumor of a trespass was unjustifiable and that I wanted him to remember that conversation because if there was any litigation to grow out of this affair that I was going to remember the conversation because I thought it would be material in the lawsuit.

"On that occasion Mr. Norsworthy also stated that he thought Mr. Carvey should agree to changing the word 'net' to 'gross' and avoid the lawsuit because, irrespective of how the lawsuit came out, he stated that it would put a cloud on the title to Mr. Carvey's property and pending the litigation he wouldn't be able to sell it to anybody else."

The Court is of the opinion that the testimony of Mr. Mathews, above cited, it the only direct testimony relating to the final negotiations between the defendants and Mr. Bonbright. Bonbright was in New York and did not have any direct dealings with the defendants but had appointed Mr. Jones his attorney to conduct the negotiations. If Mr. Jones exceeded his authority or did things contrary to his instructions, Mr. Bonbright would nevertheless be bound by the action of his attorney Mr. Jones. However, there is little conflict between Mr. Bonbright's testimony, above cited, and the testimony of Mr. Mathews. Mr. Mathews testimony is uncontradicted, except that it is possible that the plaintiffs may in some manner have expressed conclusions at variance therewith, but that would necessarily be hearsay or conclusions formed by the witnesses and therefore the Court is of the opinion that such testimony, even if it conflicts, should not be considered. The Court is of the opinion, under the testimony of Mr. Mathews, above cited, that Bonbright was

not willing to perform the agreement according to its terms, but insisted upon a modification of the terms of the agreement. It is possible that Mr. Bonbright may have changed his mind to a certain extent during the negotiations, but this could not possibly alter or in any manner change or affect his final decision, which was made by Mr. Jones, as agent of Mr. Bonbright.

The Court is further of the opinion that it committed error, prejudicial to the defendants, when it, over the objection of the defendants, admitted evidence showing the amounts the plaintiffs had expended in making trips to New York in connection with these negotiations. This is especially so when it permitted the plaintiff Amidon to testify to the amount of expenses incurred by him, which he testified was $3,000, in connection with a trip which occurred considerable time after the negotiations testified to by Mr. Mathews.

The Court is of the opinion that the foregoing does not apply to commissions on the $10,000 paid by Mr. Bonbright and received by the defendants.

For the reasons stated the motion for new trial will be allowed, the verdict set aside, and a new trial granted, unless the plaintiffs file a remittitur in the sum of Four Thousand Dollars ($4,000), and if said remittitur is not filed within thirty (30) days from the filing of this opinion, the attorneys for the defendants may prepare and present an order setting aside the verdict and granting a new trial.