C. Bruce **FICKE**, Appellant,

v.

**ALASKA AIRLINES, INC.,** an Alaska corporation, and Alyeska Resort, Inc., Appellees.

No. 1698.

Supreme Court of Alaska.

July 12, 1974.

272

Charles E. Tulin, Anchorage, David W. Lennihan, Brobeck, Phleger & Harrison, San Francisco, Cal., for appellant.

Henry J. Camarot, Seattle, Wash., for appellees.

Before RABINOWITZ, C. J., ERWIN, J., and DIMOND, J. Pro Tem.

## OPINION

ERWIN, Justice.

This appeal concerns the specific performance of an agreement for the purchase of land, a hotel, swimming pool, health club and related personalty by Alyeska Resort, Inc., a wholly-owned subsidiary of Alaska Airlines, Inc., from C. Bruce Ficke. The terms of the contract and the facts of this controversy are complex because the agreement also attempted to resolve claims which had matured in the course of a prior contract to build and lease the hotel.

When negotiations for the purchase commenced in 1969, Alyeska Ski Corporation (hereinafter "Alyeska") was occupying the hotel under a lease from Ficke, the builder. A dispute had arisen on the lease; Ficke had noticed a default; and Alyeska had filed suit. In an effort to resolve this and other disputes, Alaska Airlines, holder of an option to acquire seventy per cent of Alyeska's assets, sought to purchase the hotel. An agreement was reached in January, 1970, but this lapsed because the airline was unable to perform. Under the January agreement, Ficke allowed the airline two extensions, permitting performance until May 1, 1970. Negotiations between Ficke and the airline began again in late May, culminating the next month in a second purchase contract. This June agreement was specifically enforced by the superior court.

Consideration for the property took the form of three cash payments totalling $357,500, one of $200,000 at the execution of a closing escrow, and two others of $150,000 and $7,500 upon closing; assumption of encumbrances on the hotel of $464,332; discharge of Ficke's unpaid obligation of approximately $76,000 to Alyeska for purchase of the land upon which the hotel had been erected; assignment of leaseholds to four undeveloped lots near the hotel valued at $50,000; and a note in the amount of $47,500 for the health club. The agreement also provided that the airline would make a bonus payment of 23,333

shares of its common stock, guaranteed to a value of $280,000, if Ficke would construct sixty condominiums near the hotel. Unregistered shares were to be placed in escrow, and the airline promised to use its best efforts to secure their registration. The airline also agreed to employ Ficke as "an assistant to Buyer in developing future condominiums" for a term of five years at a monthly wage of $500.

The airline was to obtain consent to the purchase by its lenders and lessors and secure Ficke's release from all personal liability on the hotel loans up to the lending limit of the bank holding the notes. On his part, Ficke was to complete a swimming pool he was constructing in discharge of his obligations under the original lease. In addition, he was to terminate all previous agreements between the parties, including in particular a guarantee executed with the hotel lease and signed by the president of Alaska Airlines purporting to bind the airline to guarantee Alyeska sixty per cent occupancy of the hotel. This guarantee had been assigned to Ficke.

An escrow was organized in July, and August 15, 1970, was set as the day of closing. In the event the airline failed to perform its obligations at closing, the agreement provided for reinstatement of the lease between Ficke and Alyeska with certain modifications.

The $200,000 payment and assignments of subleases to two of the lots were tendered in July in accordance with the agreement. The airline obtained certain consents from its lenders and lessors. The consents approved the similar January contract but prohibited the airline from paying any money or assuming any obligations in the transaction. In order to proceed with the purchase under these restrictions, the airline caused the formation of Alyeska Resort, Inc. (hereinafter "Resort"). Having earlier exercised its option to acquire control of Alyeska, the airline merged it with Resort and assigned Resort the right to purchase under the June agreement.

At the end of a ten-day grace period on August 25, 1970, the terms of the escrow had not been satisfied. After withdrawing his documents, Ficke notified the airline on August 27 that their right to purchase had been terminated and the lease reinstated. On September 18, 1970, the airline filed this suit seeking specific performance of the purchase agreement. Negotiations between the parties continued, producing an accord in November. It was not performed, but a new accord was reached in December. This second accord lapsed as well; negotiations broke off in March, 1971; and the controversy was taken to the superior court.

At trial, the parties stipulated that only rights under the June agreement and not the subsequent accords were in issue. Testimony was ultimately limited by the court to breach of the June agreement and the appropriateness of the remedy of specific performance. After receiving evidence on these issues, the court recessed and counsel prepared for a second stage of the trial in which evidence of damages suffered by Ficke in his attempts to build the condominiums was to be presented. Before reconvening, the superior court granted specific performance. Ficke promptly moved to reopen the trial to hear evidence of his damages and the defense of unclean hands. From denial of the motion and from the judgment decreeing specific performance, he has taken this appeal.

Ficke contends that there were inadequate grounds for the decree and that he was denied due process of law by being prevented from presenting evidence on the defense of unclean hands and the extent of his damages. He also argues that, if the judgment is to be affirmed, he should be entitled to a larger payment than awarded by the superior court.

## I. SPECIFIC PERFORMANCE

The superior court found that Ficke, the airline and Resort all had breached the June agreement but that, because Ficke

had continued to accept benefits under the terms for the sale, he could not deny the appellees' right to purchase the property. The only default Ficke was found able to assert was the airline's failure to use its best efforts to register the bonus stock. This was determined to be a minor breach. The paragraph of the agreement converting the sale into a lease with an option to purchase was found to work a forfeiture, was disregarded, and specific performance was decreed in favor of Resort and Alaska Airlines.

Ficke contends on appeal that the facts developed at trial were sufficiently different from the superior court's findings that the decree of specific performance amounted to an abuse of discretion. He also argues that if the contract could be specifically enforced, the paragraph converting the purchase agreement into a lease could not be disregarded.

### A. *Findings of Fact*

Our review of the superior court's findings has been guided by Alaska Rule of Civil Procedure 52(a) which requires:

In all actions tried upon the facts without a jury . . . [f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunty of the trial court to judge of the credibility of the witnesses.

We have said before that the effect of Civil Rule 52(a) is to allow us to reject a trial court finding only

when, although there may be evidence to support it, we are left with the definite and firm conviction on the entire record that a mistake has been committed.

Alaska Foods, Inc. v. American Mfr's. Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971) (footnote omitted).

Ficke argues that the record does not support the superior court's finding that he breached the June agreement by failing to complete the hotel swimming pool by the date of closing, by failing to pay overdue interest on the loan and by not tendering a marketable title or an inventory of personal property associated with the hotel.

#### 1. Appellant's breach

*Construction of the swimming pool.* The record discloses that construction of the swimming pool was completed by the date of closing. The pool was then open for swimming and adequate for its purpose as a fire protection reservoir. Nevertheless, it was apparent at the pool's earliest use that it had serious structural defects. These prevented swimming for more than one hundred fifty days from June, 1970, to the spring of 1971.[1] Repair required pour-

1. When the sale contract was being negotiated, the parties entered into a separate agreement and warranty on the pool. Performance of the separate agreement was deemed part of the consideration for purchase of the hotel. Ficke recognized the existence of structural defects in the pool and promised their repair before June 1, 1970. If these repairs, including a new floor, were not timely completed, liquidated damages were to be assessable against him. Thus, while the June contract made construction of the pool before the day of closing a condition to the sale, Ficke was also bound by the separate agreement to complete the project by June 1.

Ficke argues that the superior court's finding under the June agreement that the pool was not completed by the day of closing is contradicted by the court's limited award of liquidated damages under the separate agreement. The appellees had claimed that the structure was unusable as a swimming pool from June 1 to August 15, 1970, and for another 75 days in March and April of 1971, but the final accounting between the parties allowed the appellees liquidated damages only for the period from June to August, 1970. Ficke infers from the absence of any award for the period after August 15, 1970, that the court must have believed the pool completed by the day of closing.

A reading of the record discloses that the appellees asserted Ficke's liability for both periods but accepted his claim that only half the sum was due as a compromise on the contested accounting following the decree for specific performance. The more appropriate inference is not that the court believed the pool was completed by August 15 but that the appellees, successful at trial, chose to relinquish their claim for the additional sum.

ing an entire new floor secured with rods to the original walls. Given evidence of construction so defective from the outset that the structure was unsuited to one of its intended uses for a lengthy period, the superior court made no clear error in finding that substantial completion of the pool did not occur until repairs had been made in the spring of 1971.

*Payment of overdue interest.* We are also satisfied that the superior court was correct in determining that Ficke did not pay overdue interest as he had agreed. Under the contract Ficke was to pay all interest on the hotel loans up to May 23, 1970, with the appellees responsible for interest accruing thereafter. Ficke never made this payment. On September 18, 1970, after the date for closing had passed, the appellees paid interest overdue from November, 1969, in order to keep the bank from foreclosing on the property and to promote refinancing in their attempt to perform. Ficke did not object to this payment, nor did he allocate any of the funds he later paid to the bank as interest for the period preceding May, 1970.

*Tender of inventory.* We are also unable to find error in the superior court's determination that Ficke breached a promise to tender an inventory of the purchased properties. Ficke concedes that no inventory was provided but contends that under the agreement one had not been promised. During examination of one of the appellees' negotiators in the sale, there was testimony that the desire for an inventory was raised before Ficke and two of his attorneys and that one of his representatives promised that an inventory would be attached to the bill of sale. The only rebuttal to this testimony was Ficke's statement that no inventory was delivered because he "didn't know it was his responsibility."

An attorney retained to negotiate the terms of an agreement binds his client to promises made within the scope of that authority. Robertson v. Carvey, 9 Alaska 488, 498 (1939). The promise here was made by Ficke's principal representative. An inventory was incidental to the subject matter of the sale and therefore was within the scope of his attorney's authority. Consequently, the promise to provide an inventory binds his client. With directly conflicting evidence, we are unable to say that the superior court committed error in finding that delivery of an inventory became a part of the bargain but that tender never occurred.

*Tender of marketable title.* However, we conclude that it was a clear error for the superior court to find that Ficke did not escrow a marketable title to the property. The land which Ficke was obligated to convey under the June agreement was part fee land and part land leased from the state by Alyeska and assigned to Ficke. He agreed to assign his interest in the leased land to Resort. However, the prior assignment of the lease to him from Alyeska had never been recorded and was not among the exceptions to the title report enumerated in the June agreement as acceptable to the appellees.

Existence of the assignment was discovered from court records in the course of a title search by the appellees. Ficke's assignment would have transferred his entire interest to Resort free of any claim under the unrecorded lease, but the lease itself would have remained a blemish on the chain of title. The superior court's finding that title to the leased property was unmarketable was based upon this outstanding interest. Yet because Alyeska had been merged with Resort and Ficke was prepared to assign his entire interest to Resort, the unrecorded assignment from Alyeska to Ficke posed no real threat of a conflicting claim to the property. While there was testimony by a title examiner that the unrecorded lease would remain in the chain of title until a mutual termination was signed by Ficke and Alyeska or a quitclaim deed given back to Alyeska, the witness also stated that Ficke's promised assignment would give Resort a title free of any claims under the unrecorded lease.

The meaning of marketable title is not determined by title examining practices; a marketable title is not a perfect one. The test is whether a conveyance carries with it a reasonable probability that the purchaser will be subjected to a lawsuit. 6 R. Powell, The Law of Real Property § 928, at 340 (1973). *See, e. g.,* Brown v. Herman, 75 Wash.2d 816, 454 P. 2d 212, 216–217 (1969). That Ficke's assignment from Alyeska would remain outstanding is only a technical defect which does not support a reasonable question of the validity of the appellees' prospective title.

In sum, although it was a clear error to conclude that the title Ficke was prepared to tender was not marketable, there was adequate evidence to support the superior court's findings that Ficke breached the June agreement when he failed to complete construction of the hotel swimming pool by the day of closing, did not pay overdue interest on the hotel loans up to May, 1970, and did not provide an inventory of the personal property to be conveyed.

### 2. Appellees' breach

Ficke also argues that there were more instances of breach by the appellees than the superior court found. We agree with several of his points. First, the record shows the $150,000 payment, due August 15, 1970, to have been tendered on September 10. But the tender was conditioned upon Ficke's agreement to a ninety-day extension of the appellees' time for performance. Second, the note for the balance due on the health club was not tendered until November 23, 1970.[2] Third, leases to two of the lots near the hotel upon which Ficke was to build condominiums were never freed of a security interest attaching from a loan to Alyeska.

*Consent of lenders and lessors.* On the other hand, we can find no clear mistake in the superior court's conclusion that the limited consents obtained by the airline from its lenders and lessors did not breach the June agreement. On directly conflicting evidence the trial court found that Ficke knew of the limited consents before he accepted the initial $200,000 cash payment and entered the escrow agreement. Proceeding with the sale with knowledge that the airline was prohibited by these consents from expending funds or assuming obligations waives any condition that unqualified approval be obtained.

*Delegation of duties.* Nor can we find clear error in the superior court's conclusion that the airline's rights and obligations under the June contract were assignable, in part, to its subsidiary, Resort. Ficke contends there was no agreement that the airline could delegate its obligations to assume the hotel loans and procure Ficke's release from personal liability on them. The contract provides in part:

(16) *Miscellaneous:*

. . . . . .

(b) Although this Agreement may be assigned by Buyer to a third party, the employment contract of C. Bruce Ficke . . . will be between Seller and Alaska Airlines, Inc.

In addition, the record bears testimony that Ficke knew of the airline's intention to assign its interest to a subsidiary at the time the contract was formed. If Ficke knew, as the court found, that the airline was prohibited by the limited consents from expending funds or assuming obligations, then in accepting the $200,000 payment from Resort he must have intended to allow these obligations to be discharged by the subsidiary. Indeed, the escrow agreement which Ficke and the airline signed upon tender of the $200,000 recognizes a

---

2. A down payment of $7,500 due at the August closing was never deposited in the escrow. There was testimony that the payment was to be waived to offset a part of the appellees' damages under the separate pool agreement. In any event, the appellant does not contend that the appellees' failure to tender the $7,500 constituted a breach of the June agreement.

delegation of duties to Resort.[3] On this evidence, it was not clearly erroneous for the superior court to find an intention that part of the airline's obligations were delegable to Resort.

*Interest payments.* Finally, Ficke claims that the appellees failed to keep interest payments on the hotel loans current. A promise to this effect arose out of the December accord. The parties agreed prior to trial that they claimed no benefits of promises made under the accords. Instead, they elected to litigate their rights under the June agreement. Accordingly, because the appellees did not promise in the June agreement to keep the hotel loans current, the failure to undertake this obligation cannot be asserted as a breach.

Ficke was entitled on the evidence to the superior court's findings that the airline did not use its best efforts to secure registration of the bonus stock and was not prepared to release Ficke from liability on the hotel notes until March, 1971. In addition, the court should have concluded, (1) that the late tender of the $150,000 cash payment was conditioned upon an extension of the time for performance of other terms of the agreement; (2) that the note for purchase of the health club was not tendered until November, 1970; and (3) that leases to two of the four lots were never freed of security interests.

## B. *Effect of the Parties' Failures of Performance*

The superior court took the view that a possibility of delay in performance had been contemplated by the parties, so that the appellees' · failure to tender complete performance on the day of closing was no breach of the agreement. It also determined that Ficke could not terminate the right to purchase upon the appellees' inability to perform because through the period of delay he accepted benefits under the

sale portion of the agreement. Thus, the superior court held Ficke equitably estopped to deny the appellees' right to purchase when they were finally capable of consummating the bargain. Ficke's contention is that time was of the essence under the contract with the effect that performance became due promptly upon the day of closing. The benefits he received from the appellees' attempts to perform, he argues, were due him regardless of whether he had terminated the appellees' right to purchase and reinstated the lease.

### 1. Time as the essence of the agreement.

■ After thirteen days of trial, during which the history of this controversy was recounted in great detail, the trial court concluded:

> [P]rior to and at the time the parties entered into the June 5, 1970, Agreement . . . both . . . were in financial difficulties to the extent [that] the plans they had for developing and purchasing and selling the resort here in question and the related facilities were beyond their financial abilities. This finding is buttressed by the previous negotiations of the parties in connection with the development and purchase and sale of the property. I therefore find that both parties entered into this Agreement knowing of the financial instability of each other, both of them hoping that regardless of the financial difficulties of the other that through their combined efforts financing for the sale and purchase of this resort together with the building of additional condominiums could be accomplished within a reasonable time.

Under the lapsed January, 1970, agreement, there had been two extensions permitting the airline to attempt performance until May, 1970. In the subsequent June agreement, there is nothing which makes prompt

---

3. The escrow agreement states in part:
 WHEREAS, the Purchase Agreement has been assigned by Alaska [Airlines] to its
 wholly-owned subsidiary, Resort, which corporation has assumed the obligations thereunder . . . .

performance essential to the contract.[4] To the contrary, the superior court identified a portion of the agreement as showing an intent to proceed with the sale even if the airline were unable to perform at closing.[5] On these facts, we cannot say the court was incorrect in finding that performance on the day of closing was not intended by the parties.

### 2. Equitable estoppel.

■ When time is not the essence of a bargain, performance must still occur within a reasonable period. *E. g.*, Leiter v. Handelsman, 125 Cal.App.2d 243, 270 P.2d 563, 568 (1954); 3A A. Corbin, Contracts § 716, at 366 (1960). Appellees were unable to perform until March, 1971. Whether this delay was unreasonable is a question the superior court never reached because it found Ficke estopped to argue the point by his receipt of benefits under the sale agreement. The court concluded that payments which the appellees made after Ficke had declared a breach and attempted to reinstate the lease were due him only under the terms of a sale, that if the lease was in effect the benefits should have been returned, and that their reten-

tion barred Ficke from also arguing that the right to purchase had been terminated.

The benefits Ficke received included a $200,000 cash payment tendered when the parties entered escrow.[6] He was employed by the airline as a condominium developer at a salary of $500 per month. As an employee, he made extensive use of reduced airline fare privileges. He also enjoyed the benefit of payments by the appellees on loans and insurance on the property. Ficke's contention is that he was entitled to each of these benefits under the June agreement regardless of whether the sale or the lease portion of the contract was in effect.

*Cash payment.* Under paragraph eight of the agreement, Ficke was authorized upon the appellees' default to retain the $200,000 as prepaid rent. The superior court found this paragraph to work a forfeiture and disregarded it in ordering specific performance. If the clause worked a forfeiture, Ficke was not entitled to retain the $200,000 payment after he had indicated his intention to treat the appellees as lessees. The language of the agreement giving him that right offers no protection; if the terms work a forfeiture, a party re-

---

4. In a land sale contract, time is usually not regarded as being of the essence. Kresse v. Ryerson, 64 Ariz. 291, 169 P.2d 850, 853–854 (1946); Rothenberg v. Follman, 19 Mich. App. 383, 172 N.W.2d 845, 849–850 (1969); Kaufman v. Hastings, 93 Or. 623, 184 P. 265, 267–268 (1919).

5. Paragraph 16(g) of the agreement reads in part:
 In the event the final closing does not take place by August 25, 1970, as contemplated hereunder, because of a default by Buyer or the non-occurrence of an event within the control of the Buyer constituting a condition precedent to the closing, then the parties shall notify the Matanuska Valley Bank to extend the time limits for the development by Ficke of the condominium units.
 If the parties had intended to continue with construction of the condominiums regardless of whether the airline held the hotel as owner or lessee, this provision might not indicate that late performance had been contemplated. In that event, upon default on

the day of closing, the airline could lose its right to purchase, become again a lessee, and Ficke could proceed with construction of the condominiums with the extra time for completion granted by the above provision to compensate for loss of whatever portion of the consideration the airline was unable to tender at closing. However, as the discussion, *infra*, will show, the superior court properly found that the appellees' promise to make an additional payment for construction of condominiums was contingent upon their purchase of the hotel. The parties did not intend to continue with construction if the appellees remained lessees. Thus, the provision set out above can be interpreted only as contemplating that the right to purchase would survive inability to perform on the day of closing.

6. The $150,000 due at the escrow closing and later conditionally tendered to Ficke was deposited in the superior court upon filing of this suit and subsequently was disbursed to Ficke by stipulation pending resolution of the dispute.

lies upon them at his peril and becomes vulnerable to equitable estoppel.

█ Ficke argues, in general, that a fairly bargained-for provision of an agreement may not be disregarded even if it causes a forfeiture and, in particular, that paragraph eight does not work a forfeiture. We have previously held that a forfeiture need not be enforced by a court of equity when it orders an agreement performed. Moran v. Holman, 501 P.2d 769, 771 (Alaska 1972); McCormick v. Grove, 495 P.2d 1268, 1269 (Alaska 1972); Land Development, Inc. v. Padgett, 369 P.2d 888, 889 (Alaska 1962). The principle applies even though, as here, the provision was the product of hard bargaining between the parties. See Williams v. DeLay, 395 P.2d 839, 846 (Alaska 1964).

Whether paragraph eight imposes a penalty requires comparison of the appellees' rights under the purchase agreement with their rights under the original lease, because it is evident that the parties did not contemplate that collapse of the sale would sever their underlying relationship as lessor and lessee. Without a penalty, breach of the June agreement would leave the appellees with rights and duties, aside from their obligation to respond in damages or by specific performance, equal to those in the original lease. There would be a forfeiture if, by breach of the purchase agreement, the appellees suffered a diminution of their rights under the original lease.

Paragraph eight allowed Ficke, upon appellees' default, to reinstate the original lease with modifications and apply the $200,000 toward rent at a rate of $3,333 per month for sixty months.[7] During this period, Ficke's obligation to pay the balance of $76,000 due on his purchase of the land upon which the hotel had been built was to be suspended. In return, the airline was to hold an option to purchase the hotel at any time over the sixty month period for $1,200,000, an increase of approximately $260,000 over the contract sale price.

The provisions crediting the cash payments to rent and preserving the option to purchase do not alone demonstrate that paragraph eight does not work a forfeiture. Breach of the agreement would cause a loss to appellees equal to the use value of the declining balance of the retained $200,000 over the sixty month period plus the use value of the suspended payments on Ficke's $76,000 land purchase obligation. As a benefit, the appellees would gain an option to immediately purchase the hotel for $1,200,000. This option could be said to have been more valuable than the option created by the original lease because it was exercisable immediately and at any time until the cash payments had been exhausted as rent, while the original option was not exercisable until 1978, ten years after the hotel had been constructed. Another potential benefit of the option in paragraph eight might have followed from the fixed price of $1,200,000. The original option set the price as the higher of the property's value at the time of construction or at the time the option would have become exercisable in 1978.[8]

In order to conclude on appeal that the appellees are not penalized for their breach, there must be a showing that the gains and losses suffered by operation of paragraph eight are of equal value. Beyond pointing out that both the original lease and the paragraph eight lease contain options to purchase and that the latter returns the appellees' purchase payments as prepaid rent, Ficke has made no attempt to

---

7. If the appellees failed to pay the remaining monthly rental, which would average $9,264.50, the paragraph permitted Ficke to terminate the lease and retain the balance as liquidated damages.

8. Under the original lease, ten per cent of the rental payments were to be credited against the 1978 purchase price.

The June agreement also resolved the parties dispute over the construction cost of the hotel from which lease rentals were calculated. Under the reinstated lease, the appellees would have benefited from lower rental payments until they exercised the option to purchase.

establish that equivalency.[9] As a result, we are unable to say that the superior court was clearly erroneous in concluding that a penalty would have been exacted by paragraph eight for the appellees' failure to complete the purchase. Applying the principle that a forfeiture, even if bargained for, need not be enforced by a court in equity, Ficke may not argue that he was entitled to retain the $200,000.

*Salary and travel benefits.* Whether Ficke was entitled to his salary and travel privileges[10] turns upon whether his employment contract with the airline continued in effect after he had declared a breach of the agreement and attempted to terminate the appellees' right to purchase. Implicit in the superior court's finding that these were benefits available only from the purchase is a determination that there was no intention to pay a bonus price of $280,000 for construction of condominiums and thus no need for the appellant's employment as a condominium developer if the appellees were to remain merely lessees of the hotel. We believe this to be the correct analysis. There was testimony that the initial asking price for the property, well over $1,000,000, was reduced to $900,000 in the January, 1970, agreement when a provision for a contingent payment for the condominiums was added. In the June agreement this price structure was preserved, and a new paragraph eight increased the purchase price to $1,200,000 if

the modified lease and option were reinstated.[11] In view of this price structure and the directly conflicting testimony on the employment issue, we find adequate support for the superior court's conclusion that the condominium construction terms and, therefore, Ficke's employment "as an assistant to Buyer in the development of future condominiums" were dependent upon the right to purchase the hotel. Once Ficke abandoned the sale and attempted to invoke the lease provisions of the agreement, he was obligated to refuse further salary payments and to no longer take the benefit of employee privileges. Instead, he continued to draw his salary and travel at reduced fares.

*Hotel payments.* A final benefit Ficke received from the appellees as purchasers, to which he was not entitled as lessor, was payments on the loans, insurance and a sprinkler system for the hotel. The June agreement required Ficke to pay all interest accruing prior to May, 1970, and required the airline as purchaser to pay interest accruing thereafter. Following Ficke's declaration that the right to purchase had been terminated because of the appellees' delay, Resort paid interest of $16,546 overdue from November, 1969, to May, 1970, and $27,701 accruing from May to September, 1970. In March, 1971, Resort paid $15,509.28 to bring the interest current to February 28, 1971.[12] Resort had also assumed a note for the hotel

9. Ficke also argues that equity which the trial court found the appellees to have invested in the property should not have been considered in determining whether the agreement caused a forfeiture or whether specific performance was equitable. We are persuaded that the bulk of the equity was invested by Alyeska as lessee-optionee and not as a purchaser under the June agreement. Detailed exposition of our reasons for this conclusion as to each of the many elements of the equity has been omitted because our decision does not rest upon the threat of dollar loss to appellees but upon the doctrine of equitable estoppel against the appellant.

10. The record shows payments to Ficke under the employment contract totalling $7,561.73 at the time of trial. The contract

became effective May 1, 1970; the first payment was made in December, 1970. When negotiations broke off for the final time in March, 1971, Ficke had received $5,114.04. None of this amount was returned to the appellees.

The salary was designed to be just large enough to allow Ficke to take advantage of air travel privileges. Between May 1, 1970, and August 31, 1971, Ficke and his family received at least $10,619 worth of air travel for fares totalling $2,609, as well as a few other flights of undetermined value.

11. We note that the escrow agreement executed by the parties combines both the consideration for the sale and payment for the condominiums as the "total purchase price."

12. After March, 1971, Ficke paid an additional $59,137.87 on the loans.

sprinkler system and made payments totalling $6,600. Ficke's share of the hotel insurance for 1970 was paid by Resort as well as $7,233 beyond what Resort was obligated as lessee to pay for the year 1971.

These benefits—the $200,000 cash payment, the salary and travel privileges, the loan and insurance payments—were conferred by the appellees as purchasers. Their receipt and retention by Ficke estops him to argue that the appellees' delay in performing the remainder of the obligations breaches the June agreement. *See, e. g.,* Dubail v. Medical West Building Corp., 372 S.W.2d 128, 132 (Mo.1963); West v. Peoples First Nat. Bank & Trust Co., 378 Pa. 275, 106 A.2d 427, 432 (1954).

### 3. Registration of shares.

The only instance of breach which the superior court found Ficke capable of asserting was the airline's failure to use its best efforts to secure registration of shares of its stock which were to be paid to Ficke upon construction of the condominiums. Neither Ficke nor the appellees object to this finding, but Ficke contends that it should not be characterized as a minor breach.

The stock, escrow and registration arrangement was constructed by the parties to guarantee Ficke that the bonus payment of $280,000 would be available when the condominiums were completed. The airline promised to place 23,333 unregistered shares of its stock in escrow and use its best efforts to secure their registration in order that the shares could be sold and the proceeds, guaranteed by the airline to total $280,000, substituted in the escrow. Ficke argues that the parties' intentions included using the escrowed funds to support financing of the condominiums. In his view, the airline's failure to use its best efforts to register the stock was a material breach of the contract because it prevented him from securing financing with which to begin construction of the condominiums and earn the bonus payment. The superior court rejected Ficke's argument, and there is sufficient support in the record for the finding that we may not disturb it. The written agreement does not anticipate any use of the escrowed stock or substituted funds.[13] However, as in many other issues in this dispute, there was directly contradicting testimony. A witness for the airline testified no mutual consideration had been given to any necessity for registering the shares before construction of the condominiums could begin.[14] Ficke, on the other hand, testified that the airline knew

13. The pertinent paragraphs of the contract read :

 (4) *The Contingent Price:*

 (a) Buyer shall issue and deliver to Seller upon the execution of the Closing Escrow Agreement 23,333 shares of its unregistered, fully paid and non-assessable Common Stock, which shall thereupon be deposited at a bank in an escrow or under an escrow agreement substantially in the form of Exhibit "B" attached hereto and made a part hereof.

 (b) The shares of stock issued hereunder shall be taken by Seller as investment stock, and not with a view to distribution or resale, provided, however, that Buyer has represented it is contemplating a public offering of its shares and a registration thereof on or about June 30, 1970, and has agreed that any shares · issued to Seller hereunder may ·be added, upon request of Seller, without cost to Seller, to the registration, even though such shares are held in an escrow as provided in 4(a) hereof.

 (c) In the event the registration of shares of Seller becomes effective and the shares are sold, funds derived from such sale shall, upon Seller's request, be substituted in lieu of the shares held as provided in 4(a) hereof, and the funds shall be held and administered in the same manner as the shares disposed of. If the proceeds from the sale of such stock are less than $12 per share, Buyer will bear the deficiency between the per-share sales price and $12 by adding to the escrow funds to the end that at least $280,000 shall be available in the escrow. Buyer shall be entitled to any income earned on the funds until paid over to Seller as provided herein and escrow holder shall invest the funds as provided in the Closing Escrow Agreement. In the event the proceeds exceed $12 per share, the excess shall be released forthwith ·to the Seller.

14. The witness did state that the timeliness of the $150,000 payment due on the day of closing was intended to assist in constructing

the shares had to be registered in order to secure financing for the condominiums because one of its officers inquired of a bank whether unregistered shares could be put to such a use and related the bank's reply that they were worthless for that purpose. Looking to this contradiction and the silence of the written agreement, we are unable to say that the superior court was clearly mistaken in determining that the parties did not regard the best efforts covenant to be an inducing element of their bargain. Nor do we think that the breach of this covenant should bar specific performance in favor of the appellees.[15]

 Our review of the evidence has led us to the conclusion that the judgment of the trial court was not inconsistent with the clear weight of the evidence.[16] Accordingly, we affirm its decree.

## II. DAMAGES AND THE DEFENSE OF UNCLEAN HANDS

Ficke's second point on appeal is that he was improperly prevented from introducing evidence of the plaintiffs' unclean hands and the damages he suffered in attempting to build condominiums under the June agreement.

Following the parties' opening statements, the trial judge ruled that testimony would be first limited to breach of the June agreement and the appropriateness of specific performance. The number of other claims raised in the lengthy opening statements indicate that the judge wished to avoid mixing evidence of other contractual issues with the central question of specific performance. Ficke had asked in a counterclaim and in his opening statement for declarations that the lease had been reinstated, that a default on the lease had

occurred, that the airline was liable on a 1968 occupancy guarantee and on the employment contract, and that the plaintiffs were obligated to undertake certain repairs to the hotel. The court responded:

> THE COURT: But after hearing opening statements, I'm going to . . . limit the testimony to the breach of the terms of the agreement of June 5, 1970 . . . and as to what has been done towards the consummation of this agreement . . .; if it has to go further then [it may] very well be necessary to broaden the testimony . . . .
>
> . . . . . .
>
> THE COURT: Well, in other words, you want to show this to show previous dealings with the parties. Well, it might very well be admissible.
>
> . . . . . .
>
> THE COURT: But generally speaking, I'll allow you to put in anything that tends to explain something that is not clear or tends to impeach the testimony of the parties.

By this and other rulings, we conclude that the trial court was willing to hear all evidence bearing on specific performance but wished to postpone any questions of money damages until all evidence going to the former issue had been adduced.

After hearing evidence on specific performance, the court took the issue under advisement and adjourned to allow the parties to prepare for a second stage of the trial at which Ficke's claim for damages was to be heard. Before court reconvened, however, the judge issued a decision in favor of the appellees and declined to allow further proceedings. Ficke moved to reopen the case to present evidence of the appellees' unclean hands and the damages

---

the condominiums. This testimony is supported by paragraph 16(g) of the agreement set out in note 2 *supra*. If the $150,000 was not promptly paid so that construction of the condominiums could begin in the fall of 1970, Ficke was to be given an additional year to complete the project.

15. We recognize that an alternate analysis —whether the airline's duty to register their

stock expired when Ficke attempted to extinguish the appellees' right to purchase— would also be appropriate. Under either analysis we conclude that the appellees are not barred from specific performance.

16. *See* Jameson v. Wurtz, 396 P.2d 68, 74 (Alaska 1964); *accord*, Moran v. Holman, 501 P.2d 769, 771 (Alaska 1972).

he sustained in attempting to build the condominiums. This motion was denied.

## A. *Defense of Unclean Hands.*

Ficke's counsel briefly noted in his opening statement that he intended to support a defense of unclean hands with evidence of an alleged signing and repudiation of an occupancy guarantee and by evidence of appellees' breaches of the accords. Both the guarantee and the breaches of the accords were also relevant to other issues barred by the court's ruling that only evidence going to specific performance was to be heard first. For example, under Ficke's counterclaim, the occupancy guarantee was in issue to determine damages Ficke suffered by the airline's repudiation. If specific performance in favor of the plaintiffs was warranted, then the question of liability on the guarantee and the nature of rights arising would not have been reached by the trial court. Thus, despite the brief mention of a connection between the guarantee and the accords with a defense of unclean hands, their relevance to the appropriateness of specific performance rather than the question of damages was not always apparent.

Three times in the course of the trial, Ficke's counsel offered the guarantee in evidence. On the first occasion, the following exchange occurred:

MR. LENNIHAN [counsel for Ficke]: I'll offer at this time in evidence . . . a lease contract, personal guarantee and occupancy guarantee.

. . . . . .

THE COURT: What's the relevancy of these, Mr. Lennihan?

. . . . . .

MR. LENNIHAN: . . . As to the relevance of this question . . . the opening statements and the reliefs sought all concern the lease contract as amended by the June 5 agreement in paragraph 8 thereof concern the liability of the airline on the occupancy guarantee and so forth. [*sic*] These are totally relevant, and whether they are beyond the scope of direct—in view of my remarks, I don't know—but if the court prefers me not to go into it at this time, it's all right with me.

THE COURT: Well, I don't think there's any question it's relevant to be under paragraph [8](a) if paragraph [8](a) ever comes into effect. . . .

MR. LENNIHAN: You want to limit it. . . .

THE COURT: . . . in my ruling to limit this initially to see whether or not there was substantial breach and whether or not. . . .

MR. LENNIHAN: I'll be glad to do that.

The offer of the guarantee into evidence was withdrawn. When it was offered a second time, there was a similar exchange:

MR. LENNIHAN: I want to introduce into evidence exhibit I, the occupancy guarantee. . . .

. . . . . .

THE COURT: . . . What's the relevancy of it?

MR. LENNIHAN: Yesterday we . . . reviewed the pleadings and the contentions of the parties, and we wanted judgment against Alaska Airlines, that it is liable on the incon—on the occupancy guarantee. . . . That is the relevance of the document. I had thought that we were proceeding with our counterclaim, the plaintiff having rested on his suit for specific performance.

. . . . . .

THE COURT: Let me ask you this, Mr. Lennihan: does this go toward the June 5 agreement, do you contend it goes toward the June 5 agreement relative to any breach or the carrying out of it . . . ?

MR. LENNIHAN: In the event the court should decide that the June 5 agreement is reinstated . . . the court will then have to decide under the

pleadings in the case whether or not the airline is bound by the occupancy guarantee. . . .

THE COURT: Well, this . . . .

MR. LENNIHAN: . . . now or later, I don't care (indiscernible).

THE COURT: So you contend this is a part of the June 5 agreement from the standpoint if specific performance is not granted, then revert back to [the lease].

MR. LENNIHAN: Then the airline is bound under the occupancy guarantee because the—under the June 5 agreement, the leases are reinstated and it's one of the guarantees applicable to the leases.

. . . . . .

THE COURT: Let me ask you this, Mr. Lennihan: can you first, without upsetting your plan of your case, put on the evidence in regard to the—against specific performance?

MR. LENNIHAN: Yes. I could proceed that way.

THE COURT: Why don't you do that and then let's face this other matter when it comes?

MR. LENNIHAN: All right, but then I will still require the answer . . . to admission of exhibits.

Again, the offer was withdrawn until the issue of damages arose. On both occasions, the guarantee was offered as relevant only to the issue of liability not to any inequitable behavior on the part of the airline amounting to unclean hands. The third time the guarantee was raised, the defense of unclean hands was discussed as well; but still no connection between the two was made:

MR. LENNIHAN: . . . I am now in the position to go in—to question Mr. Cheek on matters relating to the occupancy guarantee. . . .

THE COURT: Well, do you have any more witnesses . . . on the June 5 agreement first?

. . . . . .

THE COURT: I thought we—you indicated that you could, without interfering too much with your plan of your case, go into the specific performance issue and whatever the breach, whether they were entitled to specific performance or damages . . . .

MR. LENNIHAN: The only thing I— and I don't know quite whether I'm tracking the . . . court right or not —I have a little more evidence on the failure of the airline to use its best efforts to register. I have a little more evidence on the interference by the airline with Mr. Ficke's efforts to use due diligence as a selling stockholder to see to it that what was being done in the registration complied with the law. We have evidence on the question of the occupancy guaranty which I understand the court does not at this time wish to hear.

THE COURT: I want to complete if we could, the specific performance part of his complaint, and your defense on it.

MR. LENNIHAN: All right, but . . . the reason I'm enumerating these things . . . [is] so I can find out which ones you do not want to hear at this time; and with that in mind we have evidence on—we have some further evidence on their interference with our construction of the condominiums. That's—that relates somewhat, but hardly, to the—it has to do with unclean hands and so forth, but there's enough in on that in my judgment, for this purpose. We'll have evidence on Mr. Ficke's damages and I believe that is what we have. Now if the court wants to hear no more . . . on those matters, well, I'll be glad to have Mr. Camarot [counsel for plaintiffs] proceed with his motion.

Ficke makes the same argument that the court excluded relevant evidence with respect to the appellees' breach of the accords; but does not direct us to any instances in the record where the court refused to hear this evidence on the ques-

tion of specific performance. Our examination of the record shows the contrary:

THE COURT: Well, he says on this theory, that you people in the accord and satisfaction agreed to do certain things.

MR. CAMAROT: No, he goes beyond.

THE COURT: And you didn't do it and therefore that tends to show that you were dragging your feet all along.

. . . . . .

THE COURT: Isn't the course of conduct admissible?

MR. CAMAROT: All right. Just as long as it's clear that we can both have the same prerogative.

. . . . .

THE COURT: . . . [I]t would go to show a course of conduct though, would it not?

MR. LENNIHAN: It would go to show a course of conduct. It would go to show the lack of clean hands of the plaintiff in coming to this court of equity. . . .

THE COURT: Well, I'm going to admit it for the purpose of showing a course of conduct, but not for any purpose of showing that either party claims any rights under the accord and satisfaction, but only for the purpose of showing course of conduct for both parties.

MR. CAMAROT: So there's no question in my mind and as I understand it, Your Honor, we have the full right to show a course of conduct also of Mr. Ficke under the accord and satisfaction.

THE COURT: Well, sure, that's right.

■ We are not persuaded that evidence of breaches of the accords was not admitted on the issue of unclean hands. Nor do we believe that it was the court's ruling which kept evidence of the occupancy guarantee from bearing on whether the appellees were entitled to specific performance. Despite passing mention in opening and closing argument, whenever facts concerning the guarantee were offered in evidence their relevance to unclean hands was never set out. On the other hand, the appellees repeatedly presented evidence which they openly contended showed Ficke's overreaching in the sale. Other evidence before the court bore on the appellees' unclean hands, and, at one point, Ficke's counsel seemed satisfied that enough evidence on the issue had been admitted. We believe he was not foreclosed by the trial court from showing that the guarantee evidenced unclean hands. From our reading of the record, counsel regarded the guarantee as primarily relating to the question of damages; only secondarily was it intended to show unclean hands. The fact that he did not take advantage of opportunities to introduce it for this purpose must be ascribed to his own plan for managing the complexities of the case.

### B. *Damages.*

■ When the court limited testimony to the question of breach of the June agreement and the propriety of specific performance, it intended to postpone but not foreclose introduction of evidence showing Ficke's damages. One part of Ficke's damages allegedly arose from prior agreements with appellees which would terminate upon consummation of the sale. These included damages under the occupancy guarantee, obligations to pay lease rentals and taxes, to make repairs to the hotel, and to pay wages to Ficke. The decree of specific performance mooted any question of damages on these issues. However, Ficke counterclaimed for other damages allegedly suffered by the appellees' interference with his attempts to construct the sixty condominiums. These damages, flowing from one of the purchase covenants, survive the court's decree.

■ It is evident from the record that the trial court believed that adjudication of the specific performance issue would resolve every claim for damages. Acting on this belief, the court refused, after it had decreed specific performance, to reconvene for the damages stage of the trial. This was error. A party is entitled

to an opportunity to be heard on every cognizable claim properly presented to the court.[17] However, because the parties were in agreement at oral argument that these claims, although pleaded in this action, could still be asserted in a separate suit, we do not think it necessary to delay resolution of the sale any longer by remanding this case to the superior court for a hearing on the extent, if any, of Ficke's damages. If the appellant wishes, the allegations of damages in his Amendment to Counterclaim filed September 29, 1971, may be reasserted in a separate action against the appellees.

## III. ADDITIONAL PAYMENTS TO FICKE UNDER A DECREE OF SPECIFIC PERFORMANCE.

The appellant's third principal point is that, if the decree of specific performance is upheld, he should be awarded the benefits of the accords. This is proper, he argues, because the effect of the decree is to give the appellees the benefit of the accords. We have taken this to mean that the accords were bargains for extensions of the appellees' time for performance and that their failure to perform and successful suit to enforce the agreement in effect gave them additional time, that is, the benefit of the accords. This contention is without merit. It is met by reiterating that both parties waived any claim under the accords; it was the June agreement which was enforced by the superior court.[18]

17. U.S.Const. amend. XIV, § 1; Alaska Const. art. 1, § 7. *See* Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865, 872–873 (1950).

18. Ficke also seeks an award of rent for the period from August 15, 1970, the agreed upon date of closing, until the day the property was actually purchased under the superior court's decree. His entire argument is:

> The Airline has had the hotel worth $1,200,000 rent free from August 15, 1970.

The judgment of the superior court is affirmed.

CONNOR, FITZGERALD and BOOCHEVER, JJ., not participating.

Ought it not to be required to pay rent as provided in the lease from August 15, 1970, until it actually purchased the hotel?

This point is too cursorily presented to warrant our attention. No attempt has been made to show that while the appellees occupied the hotel Ficke was still burdened with the obligations of ownership. Accordingly, we decline to consider the issue. Hoblit v. Greater Anchorage Area Borough, 473 P.2d 630, 632 (Alaska 1970); Weaver v. O'Meara Motor Co., 452 P.2d 87, 93 (Alaska 1969); Alaska R.App.P. 11(b)(1) [g].